# R. E. L. MORRIS v. STATE.

No. A-1453. Opinion Filed April 26, 1913.

(131 Pac. 731.)

1. **RAPE—"Rape in Second Degree"—Elements of Offense.** An act of sexual intercourse accomplished with a female, not the wife of the perpetrator, over fourteen and under the age of sixteen years, is rape in the second degree, whether such act is accomplished by means of force or with consent.

2. **SAME—Evidence of Other Offenses.** The general rule that proof of other offenses is inadmissible unless a part of the res gestae does not apply to offenses involving sexual intercourse; and evidence of other acts is admissible to show the relation and familiarity of the parties, and as tending to corroborate the testimony of the prosecutrix as to the particular act relied on for conviction.

3. **SAME.** In a prosecution for statutory rape evidence is admissible of sexual acts between the prosecutrix and the defendant prior to and subsequent to the one charged and relied upon for a conviction, as indicating continuousness of the illicit relation. In so far as the case of Cecil v. Territory, 16 Okla. 197, 82 Pac. 654, 8 Ann. Cas. 457, conflicts herewith, it is overruled.

4. **EVIDENCE—Self-Serving Acts—Proof of Other Parties.** A defendant cannot introduce evidence of his own self-serving acts and declarations not constituting a part of the res gestae, and he is not bound to make an effort to show that some other person is guilty of the crime for which he stands charged, at the peril of furnishing by his failure to act or by his silence, evidence against himself when on trial upon the charge, and the admission of such evidence over his objection, constitutes reversible error.

5. **TRIAL—Argument of Counsel.** The state, in a criminal prosecution, does not seek a conviction unless the evidence shows guilt beyond a reasonable doubt. Nor will it permit its prosecuting officers to use any unfair means in the trial, or illegal argument in his address to the jury, to the prejudice of the defendant.

6. **RAPE—Evidence of Prosecutrix—Corroboration—Necessity.** While it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the prosecutrix, it is nevertheless equally well settled that, when such evidence is inherently improbable and almost incredible, there must be corroboration by other evidence as to the principal facts to sustain a conviction.

(Syllabus by the Court.)

*Error from District Court, Greer County;*
*G. A. Brown, Judge.*

* R. E. L. Morris was convicted of statutory rape, and brings error. Reversed.

*A. R. Garrett,* for plaintiff in error.

*Chas. West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. Plaintiff in error, hereinafter referred to as the defendant, was, in the district court of Greer county, convicted under an information filed in said court May 9, 1910, the charging part of which is as follows:

"On or about the 6th day of June, 1909, in the county of Greer, state of Oklahoma, one R. E. L. Morris, a male person, did then and there unlawfully and feloniously have, commit, and accomplish an act of sexual intercourse with Lola Morris, a female person, and did then and there carnally know and ravish the said Lola Morris; she (the said Lola Morris) being then and there under the age of 16 years and not the wife of the said R. E. L. Morris."

The judgment and sentence of the court entered July 18, 1911, was that he serve a term of 50 years' imprisonment. To reverse the judgment, an appeal by case-made was perfected.

The facts and circumstances surrounding this case, as disclosed by the evidence, are as follows: The defendant, when 20 years of age, married a widow 31 years of age; she having four children at the time. They lived together in Mississippi, where they were married, for about eight years, and then separated. Three children were born of this marriage. About one year after the separation, the wife moved to Texas with the children. Between three and four years later, after some correspondence between the defendant and his wife regarding their children, he went to Texas and with their mother's concent took his two oldest daughters to Oklahoma and went to farming; his mother keeping house for him.

The conviction was had upon the uncorroborated testimony of the defendant's oldest daughter, Lola Morris, who testified, in substance, that she and her next younger sister went to live with her father and his mother in March, 1905, near Granite, Okla. That in June, 1905, they moved to Caddo county and lived with one of her father's brothers, and while there she and her sister slept on a pallet on the floor in a room with their grandmother, and there her father had sexual intercourse with her the first time by coming to her pallet. That at that time she was 12 years of age. That he repeated the act three or four times a week while they were at his brother's. That in a short time they moved to another place in Caddo county and lived there in a house of one room for about a year, and the defendant continued to have intercourse with her every night or two while they lived there. That they then moved back to Greer county, and in 1909 they lived near Reed. That the defendant continued to have intercourse with her off and on all the time while he was at home. That here they lived in a two-room house; the defendant and his mother had beds in one room, and she and her sister had a bed on the floor in the other room, where it was his habit to come and have intercourse with her. That on Sunday night, June 6, 1909, the time alleged in the information, he had intercourse with her, and as the result she became pregnant and gave birth to a child March 2, 1910. She was then asked whether or not the defendant continued to have sexual intercourse with her after the act on the first Sunday in June, 1909, and over the objection of the defendant answered:

"A. Well, he continued on; he was not at home all the time, but once in a while he would be and when he was there it was every night or two. He was never gone over two weeks at a time, and when he was there it was every night that he had intercourse with me up until the last part of August or the first of September."

That her grandmother and sister had no knowledge of

the defendant's improper relations with her. She further tes-
tified that along in October or November he tried in various
ways to cause her to miscarry and gave her medicine to cause
a miscarriage, and that he said "he didn't want any one to
know that it was him;" and "he told me to tell that it was some
one else; that I didn't know;" and "he told me to tell that I
was out walking one evening, somewhere about dusk, and that
a man passed by and stopped and had intercourse with me;"
and "that this man came two or three nights after that to my
bed in my room." That she told this story first to Mrs. Meade
when she was confined, and afterwards to Mr. Henry, the county
attorney, and to Sheriff Tittle. And also old the story to
the defendant's attorneys, and that Lawyer Morris said that,
if her father was guilty, he would not defend him, and she
told him her father was not guilty. That after her mother
had been with her a month she first told the truth by making
a statement at her uncle's, her mother's brother, in accordance
with her testimony. She also stated that her father took her
and her sister to Sunday school whenever he was at home. She
further stated that she played dominoes with a boy about
her own age while she was herding cows, and that there was
a water hole near the house and the neighbors' boys would
come up there to water their horses, and sometimes they would
come to the well and to the house for a drink when her father
was away from home. That there was one boy that wanted
to take her buggy riding, but her father told her she could not
go and he would not allow her to keep company with the
boys or go driving with them, and she said, "I guess I can go
with them when I am 16;" and he said, "I will see about it;"
that she "thought a right smart of a boy down there, but he
was not exactly a lover;" his name was Will Alexander. That
she went back to Texas with her mother and there married
D. W. Baldock.

Ethel Tolliver, a half-sister, testified that Lola Morris
would be 18 years of age August 1, 1911.

Pauline Morris testified that she was 14 years old January 21, 1909, and had lived with her sister, father, and grandmother for several years. She was then asked and permitted to answer over the defendant's objection: "Did your father ever make any effort to find out who was the father of that child, as far as you know? A. No, sir."

On behalf of the defendant, Sheriff Tittle testified that he heard Mr. Morris, an attorney, ask Lola Morris if her father was the father of the child and she answered that he was not. That, when the defendant's attorneys insisted that she tell the truth of the matter, "she said she first met a man out from the house and afterwards he had been at the house." That at the time of this trial the defendant had been in his custody in the jail for ten months.

J. W. Morris, a brother of the defendant, testified that after her confinement he heard her tell the defendant's mother that there were three persons she had improper relations with; two of their names she did not know, and the other was a young man named "Knight," and he had left the country, but she did not know who was the father of her child.

The testimony of Mrs. J. W. Morris was substantially to the same effect.

Mrs. Meade testified that she was with Lola Morris during her confinement and questioned her about who was the father of the child and she answered that she did not know.

W. E. Meade testified that in 1909 he lived one-half mile from the defendant; that there was a locust grove of about two acres near the defendant's house; that Mr. Pressley farmed the land around the house and he had two sons, one grown, the other about 16 years old; that he frequently saw young men go to the defendant's house or about the house.

Several character witnesses testified that they knew the reputation of R. E. L. Morris in the Reed community as to being a moral man and that his reputation was good.

The defendant, as a witness on his own behalf, testified

that during the year 1909 he traveled selling medicine, making regular trips of from one to two weeks; that his mother kept house and cared for his two daughters, Lola and Pauline; that his mother was aged and her health was poor, and that she had died shortly after his arrest; that his brother Rev. A. M. Morris lived a near neighbor. He denied having had improper relations of any kind at any time or at any place with his daughter Lola, and testified directly contrary to her on all material points. He stated that she told him Mack Alexander's boy, about 19 years of age, often came there and talked to her; that Mr. Pressley cultivated the place he lived on and he had two boys nearly grown; that Mr. Richardson had 50 head of hogs in a pasture there that summer and his two sons were there every day he was at home, drawing water from the well for the hogs; that Mr. Rogers, a neighbor, had two unmarried boys at home that were often about his place; and that Mr. Depew had sons that were about grown, and that Mr. Higgins had a hired man working on the crop there. That the first he knew of the trouble his mother told him that Lola's monthly periods failed and he would have to get some medicine for her, so he obtained some Wine of Cardui from a merchant at Reed, and his mother informed him every time he came home that it did not have the proper effect. That after using three bottles his mother said to him, "I am afraid that your daughter is ruined." When he found out the condition that she was in he asked her about it. She claimed that she did not know anything for some time; finally she claimed "that she had met a party up the road, and later on some one had come to her bed when she was sleeping in the doorway." He denied advising her to procure a miscarriage; also that he advised her to make any statement about how she got that way. And the reason that he never inquired of his daughter Pauline about the matter was, "I considered it too delicate a matter to talk to a child of her age upon any such subject." That Mr. Pressley and Mr. Depew were the origina-

tors of the rumors against him and went about trying to get some one to make an affidavit against him. That, "after they failed on that, then they put up a correspondence between the mother and got her to come up here and make the affidavit and I was arrested on her information," and that "Mr. Pressley and Mr. Depew had disagreed with him on religious points and they disliked him very much."

The first assignment of error is that the court erred in overruling the defendant's demurrer to the information. We think the demurrer was properly overruled.

In the case of *Myers v. State,* 6 Okla. Cr. 389, 119 Pac. 136, it is said:

"The allegation, 'rape, ravish, and carnally know, would be fully sustained by proof of carnal intercourse with a female under the age of 16 years. Whether the act is accomplished by means of force or with consent is immaterial. Therefore this clause did not extend, limit, or modify the crime charged, and might have been omitted. However, it is not inconsistent, and, at most, it may be treated as mere redundance."

The information is sufficient.

Certain assignments of error are based upon the rulings of of the court on the admission of testimony. Now, as to these alleged errors, complaint is made to the ruling of the court admitting evidence of acts of sexual intercourse subsequent to the one charged in the information. In support of this contention counsel cites the case of *Cecil v. Territory,* 16 Okla. 197, 82 Pac. 654, 8 Ann. Cas. 457, and quotes from the opinion the following language:

"While, as above stated, former acts of sexual intercourse may be considered by the jury as corroborating evidence, it is just as well settled that such acts, occurring subsequent to the one charged and relied on for conviction, cannot be considered by the jury as corroborating evidence or for any other purpose, for they have no such tendency. Such evidence would amount simply to proving separate and distinct offenses for the purpose of rendering it more probable in the minds of the jury that the defendant committed the crime charged in the indictment."

The question is one upon which the decisions are in conflict, but by the later and better authorities the question is well settled in favor of the rule that in this class of cases evidence of acts occurring subsequent to the act for which the defendant is being tried are admissible, although such subsequent act is in and of itself a crime.

In *State v. Stone*, 74 Kan. 189, 85 Pac. 808, a prosecution for carnally knowing a female under the age of 18 years, it was held that the admission of evidence of subsequent acts of intercourse, which occurred as late as 15 months after the acts charged in the information, was not error. The rule announced in this case was approved by the same court in the case of *State v. Brown*, 85 Kan. 418, 116 Pac. 508. Johnston, C. J., in delivering the opinion, said:

"While in that case the subsequent acts were somewhat remote, there were circumstances tending to show continuousness of illicit relations. In the opinion it was said: 'Subsequent intimacy does illustrate the prior dispositions of individuals of opposite sex toward each other, and the question is how far derivable inferences may be carried backward. Manifestly this is, in the main, a question of weight and not of relevancy.' There was an effort made to have the court modify the doctrine of *State v. Stone* in *State v. Hibbard*, 76 Kan. 376, 92 Pac. 304, but after a reconsideration of the question, and the authorities the rule admitting evidence of acts of sexual intercourse occurring after the one upon which a conviction is sought was reaffirmed, and it was held that the doctrine was sustained 'not only by the better reason but by the greater weight of authority.'"

In the case of *Woodruff v. State*, 72 Neb. 815, 101 N. W. 114, it is said:

"The fact, if it be one, that the evidence tends to prove another and independent crime does not necessarily determine its admissibility as evidence of the crime charged in the case at bar. The determinative question is, Is it relevant and pertinent in establishing the offense charged, and does it throw some light on that controversy and assist in the ascertainment of the truth in respect of such charge? We feel confident in the correctness of our position in saying that it does; and, if believed, the evi-

dence is corroborative of the ultimate fact sought to be proven; that is, the act of sexual intercourse as charged in the information."

The rule announced in this case was approved by the same court in the case of *Leedom v. State,* 81 Neb. 585, 116 N. W. 496. Barnes, C. J., delivering the opinion of the court, said:

"That this evidence was introduced solely for the purpose of corroborating the prosecutrix as to 'the principal fact of her having had sexual intercourse with the defendant on the 20th day of July, 1906, was well understood; and it, as well as other acts of the same kind, which were related in time, and took place subsequently to the one specifically charged in the information, was admissible for that purpose. *People v. Mathews,* 139 Cal. 527, 73 Pac. 416; *State v. Robertson,* 121 N. C. 551, 28 S. E. 59; *Smith v. Commonwealth,* 109 Ky. 685, 60 S. W. 531; *Sykes v. State,* 112 Tenn. 572, 82 S. W. 185, 105 Am. St. Rep. 972; *State v. Borchert,* 68 Kan. 360, 74 Pac. 1108."

The question here involved is discussed in all its phases by Prof. Wigmore in his work on Evidence (volume 1, pars. 216, 398, and 399), wherein his conclusion is stated as follows:.

"That this desire at a prior or subsequent time is relevant to show the probable existence of the same desire at the time in issue is equally clear. The limits of time over which the evidence may range must depend largely on the circumstances of each case, and should be left to the discretion of the trial court. A subsequent existence of the desire is equally relevant with a prior one. It is true that the contingencies of error are different (i. e., in the former case the desire may have been first induced by intervening circumstances, in the latter it may have been ended by them); but the strength of these contingencies is no greater in one instance than in the other. If. for example, the parties have been intimate during the entire year 1890, and an act of adultery is charged on July 1st, an adulterous desire on December 31st carries no less persuasive weight than an adulterous desire on January 1st. That there is any distinction is generally repudiated. The conduct receivable to prove this desire at such prior or subsequent time is whatever would naturally be interpretable as the expression of sexual desire. Sexual intercourse is the typical sort of such conduct, but indecent or otherwise improper familiarities are equally significant. That the intercourse is also itself criminal is no objection."

On reason and by the great weight of authority, we think the correct rule is that, in a prosecution for "statutory" rape, evidence of other acts of sexual intercourse between the same parties is admissible, including evidence of acts committed subsequent to the particular act relied upon for conviction, even though it proves other and distinctive offenses as relevant to show the true relation of the parties to each other, and to characterize and explain the act for which the defendant is on trial. It is the general desire to satisfy lust that is involved in this class of cases, and this character of evidence tends to show lustful desire and disposition by showing continuousness of the illicit relation. However, the limits of time over which evidence of this kind may range is largely within the legal discretion of the trial court. In so far as the case of *Cecil v. Territory of Oklahoma, supra,* conflicts with this opinion, it is overruled.

The state, over the defendant's objections, was permitted to show by the testimony of several witnesses that, so far as they knew, the defendant made no effort to find out who caused his daughter to become pregnant. As an instance, F. M. Pickard testified that he was a deputy sheriff. The transcript then shows the following questions and answers given over the defendant's objection:

"Q. Did he solicit your aid to find out who was the father of the child? A. No, sir. He never did. Q. When you went out to arrest him, did you discuss this subject; the subject of his being the father of the child? A. He didn't have very much to say about it at that time. Q. Up to the present time, has he ever solicited your aid to get the young man whom he claimed was the father of the child? A. Mr. Morris never talked to me or asked my assistance to get any one or help him in any way that I remember. Q. Did he make any efforts to find out who was the father of the child as far as you know? A. Mr. Morris has never made any pretense toward asking me to help him find out who was the father of that child. Q. Did he ever make any pretenses towards asking anybody else or making any effort to find out, as far as you know? A. No, sir; he never did."

This testimony and other testimony of like character was

clearly inadmissible. A defendant cannot introduce evidence of his own self-serving acts and declarations not constituting a part of the *res gestae,* and surely it cannot be that there is any such anomaly in the criminal law or rules of evidence as is involved in the proposition that a defendant charged by indictment or information is bound to make an effort to show that some other person is guilty of the crime for which he stands charged, at the peril of furnishing, by his failure to act or by his silence, evidence against himself when on trial upon the charge. Manifestly the object of this method of proof was to impress the jury with the idea that, if the defendant was not guilty, it was his duty to show who was the guilty party. We think the testimony elicited by the questions asked was prejudicial to the substantial rights of the defendant.

Another error assigned is based upon the record as follows:

"Bill of Exceptions No. 2: Be it remembered, that upon the trial of the above-entitled and numbered cause, the following proceedings were had, to wit: H. D. Henry, the county attorney, was addressing the jury in the opening argument for the state, and was referring to the evidence of S. H. Tittle wherein Tittle had testified that he was present in the spring of 1910 in Mangum when the prosecuting witness, Lola Morris was present and A. R. Garrett, A. J. Morris, attorneys for the defendant, and said Morris and Garrett had a conversation with her and in which conversation the said Morris asked Lola Morris who was the father of her child, and urged her to tell who the father was, and in which conversation the witness Lola Morris denied that her father was the father of her child, and the attorney Morris told the said Lola Morris it was her duty to tell it if her father was guilty, and that he (Morris) would not appear and defend her father if he was guilty, and if she said he was guilty he would not represent her father, and in this connection the county attorney, H. D. Henry, said 'I don't know why Morris is not here,' to which statement the defendant's attorney excepted, and the court not having heard the statement, being some distance from the county attorney at the time it was made, permitted the argument to continue, and the county attorney again repeated, 'That he did not know why Morris [meaning the attorney for the defendant] was not here,' and

again the defendant excepted.   Whereupon the court, addressing
Mr. Henry, said, 'Why do you repeat this and refer to this mat-
ter,' and Mr. Henry replied, 'It is a part of the record, and I
have a right to refer to it; it was unexplained why Morris was
not here.'   Again the defendant excepted to the remarks of the
county attorney, and the court then and there reprimanded the
county attorney and instructed the jury that they should not con-
sider said remark, and should not consider why the said Morris
was not present; that his absence had nothing to do with the
case, and that the defendant must be tried upon the evidence
alone, and told the county attorney he must not refer to this
matter again.   Which bill of exceptions is here allowed as being
true and correct with the following qualifications, viz.:   At the
time of defendant's exception, the counsel, assisting in the prose-
cution, stated in the presence and hearing of the jury that the
state did not claim the attorney A. J. Morris had quit the de-
fense because the prosecuting witness had said defendant was the
father of her child or was guilty of the charge against him.
G. A. Brown, Judge."

While prosecuting attorneys are not expected to maintain
a judicial impartiality, yet it is their duty to present a case
fairly and justly.   Obviously these remarks were highly im-
proper as a comment upon facts not in evidence before the
jury and not legally competent and admissible in evidence.   The
fact that the court rebuked the county attorney and withdrew
his remarks from the consideration of the jury may have cured
the vice, yet we are unable to disabuse our minds of the con-
viction that, all the circumstances being considered, the defend-
ant may have been seriously prejudiced.

Finally it is contended that the evidence is insufficient to
justify or sustain the verdict in that there is no corroborating
evidence nor a single corroborating circumstance tending to con-
nect the defendant with the commission of the crime.   This
court does not hold with some that, as a matter of law, rape
cannot be established by the uncorroborated testimony of the
prosecutrix, but in common with all courts recognizes that,
without such corroboration, her testimony must be clear and
convincing.   And, where the testimony of the prosecutrix bears

upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law. The testimony of the prosecutrix that the incestuous relations continued for nearly five years without being detected or discovered by her grandmother or her sister, one or both being present in the room at all times, is incredible. The evidence shows an intense enmity existing for many years between her father and her mother, and it is significant that she had been with her mother more than a month before she changed her former statements by making this unsupported charge against her father. And there is no claim of threats or fear in explaining of her delay in making this statement. The opportunity was ample, and it seems far more probable that some of the young men that the evidence shows frequented her home was the father of her child; and when we consider the testimony of the prosecutrix as a whole with its contradictions and inconsistencies, and that the facts and circumstances in evidence all tend to discredit her, and consider that the evidence of the defendant's character for virtue and morality, and that he constantly during these years attended church and Sunday school with his two daughters, is uncontradicted, we cannot help but think that the testimony of the prosecutrix was maliciously inspired and that the verdict was more the result of prejudice

or public sentiment than the calm and dispassionate conclusion of the jury upon the facts in evidence.

In the case of *State v. Gooddale,* 210 Mo. 275, 109 S. W. 9, the Supreme Court of Missouri says in discussing a case of this character:

"The all-important question on this appeal is whether the testimony in this case is sufficient to sustain the conviction of the defendant. The admonition of Lord Hale that 'it must be remembered that this is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though never so innocent,' must be heeded. While it is the law of this state, as in most others, where not modified by statute, that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, it is nevertheless equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment. While, on the one hand, it will not do to hold that, because the evidence indicates a depravity not ordinarily witnessed among men, it must be rejected, because the annals of crime are replete with examples wherein the most sacred relations have been disregarded and the testimony left no room for a reasonable doubt of the guilt of the accused, yet, on the other, many well-authenticated decisions attest that this charge has often been the result of malice and hidden motives, and the courts have refused to permit convictions to stand because of the utter improbability of the testimony, in the light of the conceded circumstances. Instinctively the character of the accused and of his accuser is a prime consideration."

In that case the court reversed the judgment on account of the unreasonableness of the evidence of the prosecuting witness, although it was a case in which an uncle was charged with rape upon his niece. The evidence in this case is far more unreasonable than the evidence in that case; and in this case, as in that, the record would give to defendant an unimpeachable character. See, also, *People v. Benson,* 6 Cal. 221, 65 Am. Dec. 506; *Mares v. Territory,* 10 N. M. 770, 65 Pac. 165; *Monroe v. State,* 71 Miss. 196, 13 South. 884; *Logan v. State,*

148 S. W. 713. The instructions correctly and fairly state the law, and the single objection thereto made is without merit.

It appears from the record that this conviction was upon a second trial, and that the defendant, being unable to give bail in the amount fixed, has now been confined almost three years. It is our opinion that the errors considered, other than the sufficiency of the evidence, require a reversal of the judgment, because the defendant was thereby denied that fair and impartial trial which the law prescribes for a person charged with crime. It is our opinion, also, that no person should be convicted of crime on such improbable, discredited, and unreasonable evidence as that given by the prosecutrix in this case.

The judgment of the district court of Greer county is therefore reversed, and the defendant discharged.

ARMSTRONG, P. J., and FURMAN, J., concur.