## LEONARD MARLOW v. STATE.

No. A-3696. Opinion Filed Jan. 7, 1922.
(202 Pac. 1048.)

(Syllabus.)

1.	**Evidence—Rape—Other Acts Admissible for Purpose of Corroboration.** Where the state elects to rely for conviction on a certain specific act of sexual intercourse between the prosecutrix and defendant, other acts of illicit intercourse between said parties, continuing from said act up until a short time prior to the commencement of the prosecution, are competent to show the intimate relation and familiarity between the parties, and as corroborative of the ultimate fact sought to be proven.

2.	**Witnesses—Cross-Examination—Right to Explain Testimony.** Where counsel for the defendant on cross-examination of the prosecuting witness ask her concerning certain acts of sexual intercourse with other persons, it is permissible that the prosecut-

ing witness be allowed to explain the circumstances under which such other acts of intercourse took place, although such evidence could have been excluded in the first instance.

3.   **Trial—Instructions—Necessity for Specific Request for Further Instructions.** For an instruction held to have been sufficient to safeguard the substantial rights of the defendant and to prevent his conviction upon evidence of any alleged act of sexual intercourse between him and the prosecuting witness except the act upon which the state elected to convict, see body of opinion.

Appeal from District Court, Bryan County; George S. March, Judge.

Leonard Marlow was convicted of the crime of rape in the second degree, and appeals. Affirmed.

Plaintiff in error, hereinafter referred to as defendant, was charged by information in the district court of Bryan county with the crime of rape in the second degree, alleged to have been committed on one Beulah Blankenship, a female under the age of 16 years and not the wife of said Leonard Marlow. The defendant was convicted and sentenced to serve a term of 4 years' imprisonment in the state penitentiary.

Defendant reached the age of 18 years in January, 1918. The act of intercourse upon which the state relied for conviction was alleged to have been committed on the 5th day of April, 1918. According to the state's witnesses the prosecuting witness, Beulah Blankenship, became 16 years of age on the 13th day of April, 1918.

The prosecuting witness, Beulah Blankenship, testified: That she lived in the country, and first met the defendant in the fall of 1916 at a neighbor's house, where a community singing was taking place. That the defendant commenced to keep company with her, beginning on Easter Sunday, which was March 31, 1918, and continued his attentions until in the spring of 1919. That on said Easter Sunday the defendant, with others, accompanied her from a neighbor's residence part of

the way home, and at that time made an engagement with her to meet her "out at the big gate north of our house; the gate that goes into our pasture." That witness first told the defendant that she was afraid to meet him out there, and that defendant then insisted, and said that he was going to be there, and witness then told him, "Well, I guess I will." Witness then testified that pursuant to such agreement she did meet the defendant out there at about 10 o'clock after her parents had gone to bed. That she and the defendant then went over and sat down in a wagon that was there close to the gate. That defendant hugged and kissed her, and asked her if she would not be good to him and let him; and witness said, "No." And defendant said, "There's no harm in it," and threw his arms around her and tried to get her to let him, and witness told him, "No." And defendant then asked if she would not the next time that she met him, and witness told him that she did not know; that she might. That on the night they separated about 12 o'clock and defendant did not have intercourse with her, but that they made arrangements to meet on the Friday night, the 5th of April, 1918, at the same place. Witness further testified that she did meet defendant at the gate on Friday night and that they walked off a piece down into the pasture and sat down about 100 yards from the gate, and the defendant asked her if she would not let him, and she told him she "did not want to." And he said. "There would be no harm," and she said, "Yes; there would." And he said, "If he got her into a bad shape, he would take and marry her," and then she gave up and let him. Witness then said that defendant tried to have intercourse with her, but could not do it for the reason that he hurt her; that his private parts penetrated her private parts, but just a little; that they only tried it that one time, and then made an engagement to meet again at the same place on Sunday night, April 7th. Witness then testified that defendant met her again on the following Sun-

day night, but did not do much, because it hurt her private parts, although he penetrated her just a little; that they made two efforts on that night; that the penetration was a little more the second time than the first, and a little more the third time than the second; that they made arrangements to meet again on the next Wednesday night, April 10th, and defendant tried three times that night, and succeeded in penetrating to the full extent one time that night; that thereafter witness and the defendant would meet on an average of twice a week and have sexual intercourse; that witness met the defendant on Saturday night, April 13th, which was her birthday and had intercourse with him at that time; that she and the defendant quit meeting or going together or having any improper relations on Sunday night, February 3, 1919; that at that time the witness was in a family way; that she became pregnant in September, 1918; that she told defendant about it; that defendant did not talk to her much about it, but acted like he did not believe it; that defendant asked her when was the last time her sickness was on, and witness told him; that witness asked him what he was "going to do about it," and defendant said he "couldn't do nothing"; that a baby was born to her on the 6th day of June, 1919, and that defendant was the father of the baby.

On cross-examination, after having been interrogated to considerable length concerning the ages and dates of birth of her brothers and sisters to the number of 12, prosecuting witness testified, in part, substantially as follows: That her first meeting with Leonard Marlow was about Christmas, 1916. That he first started to go with her in the fall of 1917. That her father would not permit her to go with boys at that time. That she had been to her sister's house, and that boys would come there to see her. That L. J. Allen had met her at her sister's house. That no boys ever came up there after they went to bed. That she had been meeting with boys for

some time before she met Leonard Marlow. That Leonard Marlow never came to her house to see her. That on some occasions she would meet him at the home of his sister-in-law. That the first time she ever met defendant in the pasture was on Wednesday night after Easter Sunday. That they had been together several times before that. That she would go to church, and he would come back with her. That she had also met him at parties a good many times. That defendant had talked to her before this Wednesday night about marrying her, and she had promised to marry him, but had never told anybody about it. That she was 15 at the time she had promised to marry him. With reference to what occurred on the Friday night after Easter Sunday, 1918, in the pasture, witness said that defendant kind of tore her up that night; that he hurt her; that there was blood and "his old stuff" on her clothes. Further in this connection the witness was asked the following questions and made the following answers:

"Q. Now, I will ask you if you didn't state in the examining trial in this case that he tried just once that night and didn't succeed in getting it in, and didn't get it in that night? A. Well, he didn't all the way, but it hurt me; he got it far enough to hurt me.

"Q. Didn't you state that he didn't get it in on that night, on the examining trial? A. I said that he didn't get it in all the way, but got it in far enough to hurt me.

"Q. Didn't you state on the examining trial that he didn't get it in that night? A. I don't remember whether I did or not.

"Q. How is that? A. I don't remember.

"Q. Now you say that there was blood on your clothes, do you? A. Yes, sir; because after I studied about it, I remember now.

"Q. Didn't you study on your examining trial? A. I didn't know whether there was blood on my clothes.

"Q. Didn't you make that statement on the examining trial? A. Yes, sir; but I had not been studying about it, and I didn't remember whether I did or not.

"Q. Who did you talk to about this since the examining trial? A. Nobody but my folks.

"Q. Anybody else? A. No, sir.

"Q. Did you talk to these lawyers any? A. That is all, and to the lawyers, Mr. Phillips and Mr. (witness is interrupted by counsel)—

"Q. Didn't they tell you that it was necessary that you testify that he did get it into you some that night? A. No, sir; they didn't tell me.

"Q. You thought about it since the examining trial? A. Yes, sir.

"Q. They said that you had some blood on your clothes? A. Yes, sir."

And further in the cross-examination the following occurred:

"Q. I will ask you—you said that this baby was born in June? A. The 6th.

"Q. The 6th of June? A. Yes, sir.

"Q. In 1919? A. Yes, sir.

"Q. During the fall of 1918 you were having intercourse with other men, weren't you? A. Yes, sir—no sir; yes, sir.

"Q. You had intercourse with Jerry Watley? A. Yes, sir.

"Q. And Ode Watley? A. Yes. sir.

"Q. Did you have intercourse with the Boyngton boy? A. No, sir.

"Q. Isn't it a fact that along about February—I will ask you if in June, 1918, you didn't have a conversation with Minnie Marlow at her home in this county in which you were dis-

cussing the conduct of girls, their conduct with boys, in which you stated that you didn't think it was wrong to have intercourse with boys, and if she didn't remark it was wrong, and also that you were liable to get into trouble, and you at that time made the statement that, if you got caught, that you were going to lay it off on Leonard?

"Mr. Phillips: We object to that, as being incompetent, irrelevant, and immaterial.

"The Court: Overruled.

"A. No, sir: I didn't tell her; I didn't make any statement to Minnie Marlow.

"Q. You didn't make that statement, in substance, to her? A. No, sir; I did not.

"Q. Now, didn't you also state to her that you was going to do that, that you was going to lay it off on Leonard, because you liked him, and that they had told you that he would have to marry you if you laid it off on him? A. No, sir.

"Q. No such conversation? A. No, sir; I did not.

"Q. Now, Miss Blankenship, isn't it a fact that after you got in a family way and your parents discovered the matter, that you then fixed the time of this intercourse with the defendant that you had, or claimed to have had, with him, just before your birthday for the purpose of getting under the age of 16? A. No, sir; I didn't."

On redirect examination the following occurred:

"Q. Who all besides this defendant did you have intercourse with in the fall of 1918? A. Sir?

"Q. Who was it you said besides this defendant that you had intercourse with in the fall of 1918? A. Jerry Watley.

"Q. Was that before or after you had told the defendant, Leonard Marlow, that you was in a family way? A. It was after I told him.

"Q. State the circumstances—how many times did you have intercourse with Jerry Watley? A. Just one time.

"Q. All right. State the circumstances.

"Mr. Cochran: Objected to because it is incompetent, irrelevant, and immaterial.

"The Court: It is cross-examination; I will permit it.

"Mr. Cochran: The purpose of that, your honor, in proving it, was to show that, the presence of this baby, we have a right to show that, and probably account for this baby. We are not permitted to go into the facts and details. It will raise an issue that will throw no light upon this other matter. We showed that it happened, the time that it happened. That is the purpose of the examination. If you go into the details of it, it will raise a collateral issue.

"The Court: Well, my opinion was that it was not permissible to ask the question, but you asked the question, and they have a right to cross-examine on it.

"Mr. Cochran: We object to it because it is incompetent, irrelevant, and immaterial.

"The Court: Overruled; go ahead.

"Mr. Cochran: Exception.

"Q. State the circumstances under which you did, and where it happened. A. Out west of the house, west of our house.

"Q. West of your house? A. Yes, sir.

"Q. In the daytime or night? A. Night.

"Q. Had you met with anybody there that night? A. Nobody only Leonard Marlow.

"Q. I didn't understand. A. Leonard was the only one, and Jerry Watley (counsel interrupts the witness)—

"Q. Did you meet Leonard before or after you met this Watley man? A. Before.

"Q. What was Leonard Marlow doing? A. Before he came up?

"Q. Yes, or at the time he came up? A. Well, he had had intercourse with me.

"Q. What was it you said? A. I said that he had had intercourse with me.

"Q. Who? A. Leonard Marlow.

"Q. Then what time, with reference to that, did you see the Watley man, or what time did he come up? A. Just after he had gotten through.

"Q. Just after who got through? A. Mr. Marlow, Leonard Marlow.

"Q. What position were you all in when Mr. Watley came up? A. We was lying down on the ground.

"Q. What time of the night was that? A. I don't know what time of the night it was then.

"Q. How long had you been out there? A. Well, not so very long; just a little while.

"Q. What did Mr. Watley say when he came up there?

"Mr. Cochran: We object to that because it is incompetent, irrelevant, and immaterial.

"The Court: Objection overruled.

"Mr. Cochran: Exception.

"Q. Answer the question. A. He said, 'Now I have caught you; if you don't do me the same, I will tell on you;' and he caught me by the hand and held me.

"Q. What did the defendant, Leonard Marlow, say? A. He just—he acted like it scared him.

"Q. What did he say? A. The first word he said, 'Well, who is that?'

"Q. Then what did he say? A. Jerry he caught me, and Leonard Marlow got up and walked off.

"Q. Did Leonard Marlow say anything? A. No; I was trying to get away, and he said I would just have to let him.

"Q. Who said that? A. Leonard said it.

"Q. Who? A. Leonard said if I didn't we would be caught.

"Q. Where did Marlow go? A. He walked off; I don't know where.

"Q. Did you see Marlow any more that night? A. Yes, sir.

"Q. When? A. After Jerry got through, he got up and walked away.

"Q. Did Marlow then come back? A. Yes, sir.

"Q. Then what was it you all did? A. We went—we just talked a little while, and I went to the house.

"Q. Who else was that that you had intercourse with? A. Ode Watley."

And the witness further testified to an identical occurrence with Ode Watley about the 1st of February, 1919; and, further, the witness testified that she had never had any intercourse with the Watley boys prior to April, 1918, and that Leonard Marlow was the first person that had ever had sexual intercourse with her.

Mollie Blankenship testified that she was the mother of Beulah Blankenship, and that Beulah Blankenship was born on the 13th day of April, 1902, and was 16 years of age on the 13th day of April, 1918. On cross-examination this witness testified that she had a son who was born on August 6, 1901. With reference to her other children witness testified as follows: George, born May 22, 1905; Lewis John, born August 6, 1901; Sidney Pearl, born April 2, 1899; Ivy, a son, born November 13, 1897; daughter, Pety May, June 21, 1896; son,

Thomas Lee, born July 15, 1895; daughter, Mary Ann, born December 23, 1893; daughter, Mattie Elta, born August 8, 1891. Witness further testified that she was basing these dates on her independent recollections, but that they had a book with entries in it, made by her husband, which was supposed to give the correct dates of birth of the various children. Whereupon the following occurred:

"Q. Have you gone over with any of these lawyers what those ages are since you have been here, when these children were born? A. No, sir; I have been telling them just what I told you.

"Q. They went over the matter with you before you testified? A. Yes, sir.

"Q. Did you see this book? A. No, sir.

"Q. You were with your husband when the entries were made in that book, weren't you? A. Why, yes, sir; I was with him.

"Q. They were correctly entered in it? A. He done the writing.

"Q. Were they correctly entered at that time? A. Yes, sir.

"Q. The entries on that book are correct? A. They were; yes, sir.

"Q. They were correctly entered in it? A. Yes, sir.

"Mr. Cochran: We would like to have that book.

"Mr. Hatchett: It is not a book; it is a kind of a slip.

"Mr. Cochran: They had a book of some sort; I don't know what condition it is in now.

"Mr. Stinson: This is the book, Mr. Cochran (handing counsel a book).

"Q. Now, this is the birth record of your family, that you have been telling about? A. Well, I think so.

"Q. Is that? A. Yes, sir.

"Q. Is that you husband's handwriting or yours? A. That is his.

"Mr. Cochran: We ask that that be identified as Defendant's Exhibit No. 1.

"The Court: What part?

"Mr. Cochran: The entire sheet.

"The Court: This sheet or that sheet?

"Mr. Cochran: This.

"The Court: Let him identify the sheet. If both of these are marked exhibits, make it separately.

"Mr. Cochran: We offer them in evidence.

"The Court: Let's get one at a time.

"Mr. Cochran: All; mark this Exhibit No. 1.

"Q. Now, you claim that record there was copied from this sheet which I hand you, identified as defendant's Exhibit No. 2; is that true? A. Yes, sir.

"Mr .Cochran: We now offer in evidence Exhibits Nos. 1 and 2."

"The same were thereupon received in evidence, and are in the words and figures following, to wit:

"Exhibit No. 1: 'Births of M. T. B. and M. C. Blankenship. Married July 29, 1888; Lorenner Blankenship, born Aug. 4, 1889. Mollie Ethel Blankenship, born August 8. 1891. Myrtle Anne Blankenship, December 23, 1892. Tommy Lee Blankenship, July 15, 1894. Dedie May Blankenship, June 21, 1896. Ivery Blankenship, November 13, 1898. Sidne Pearl Blankenship, April 2, 1899. Luiss John Blankenship, August 6, 1901. Buler Bell Blankenship, April 13, 1902. Truitt Blankenship, May 22, 1905. One boy baby born December 28, 1907, died October 13, 1907. Reva Lester Blankenship, March 16, 1908. Vera Blankenship, Nov. 8, 1910, Died August 21, 1910. Veleria

Blankenship, March 30, 1911. Fay Wanetta Blankenship born Aug. 12, 1914. Birth Rekord of W. T. B. and M. C. Blankenship. W. P. Blankenship, Oct. 4, 1865. M. H. Blankenship Feb. 23, 1872.'

"Exhibit No. 2: 'W. T. Blankenship, October 4 day, M. C. Blankinship February 23 day. 1889 L. R. Blankinship August 4 day. Mollie Eathel, 1891 Blankenship, born August, 1892. Myrtle Ann, born Dec. 1894, Tommy Le Blankinship. 1896 Dediemay Blankinship born, 1898 Ive Blankinship born, 1899 Sidney Blankinship born, 1901 Lewis John Blankinship born, 1902, Bular Bell Blankinship born, 1905, born, 1907, 1908, 1910.'

"Q. When was this sheet here torn? A. I don't know; it just been worn off by being old.

"Q. When was this sheet here prepared? A. I don't know.

"Q. Isn't it a fact that this sheet was prepared in your home during 1918? A. No, sir.

"Q. And that this sheet here was mutilated in that way at that time? A. No, sir.

"Q. That is not a fact? A. No, sir.

"Q. You mean to tell the jury that you haven't seen these dates since you have been here at the trial? A. Not that book.

"Q. Have you seen any other document with these dates in, or any other sheets? A. No, sir; I haven't seen any.

"Q. I will ask you if you didn't make the statement in the presence of Mrs. Susie Watley and Annie Marlow at Mr. Watley's house in 1918 that Beulah was 16 years of age at that time, and would be 17 in April, 1918. A. I don't remember nothing about it.

"Q. You don't remember making any such statement? A. No, sir; I don't.

"Q. You remember being over at their house about that time? A. Yes, sir.

"Q. Do you remember talking about Beulah's age at that time? A. No, sir; I don't.

"Q. You don't remember about it? A. No, sir.

"Mr. Cochran: That is all."

The witness further testified that a Mrs. Sims was present when Beulah was born, and that Beulah was born in Texas on Ed Marshall's farm, and that Lewis Watkins was the doctor who waited on her at the time of Beulah's birth.

Mary Sims, as a witness for the state, testified that she was 40 years old; that she knows Beulah Blankenship; that she was present at the time Beulah was born, and that she was born on April 13, 1902; that at the time of Beulah's birth witness was living about 200 yards from the Blankenships. On cross-examination the witness testified that she was present when George Blankenship was born; that he was born a year or two after Beulah, but that she could not remember the date of his birth exactly, but that she thought it was in May, and her best recollections was that it was along about the 22nd of May; that her recollection had been refreshed concerning these dates since she had been subpoenaed as a witness in the case.

The state also introduced a calendar for the year 1918, which disclosed that the 5th day of April, 1918, was on Friday.

The defendant thereupon introduced J. A. Shirley as a witness, who testified:

That he was an attorney at law, and attended the examining trial of Leonard Marlow, and that on that occasion the prosecuting witness testified that the first time Leonard Marlow tried to have intercourse with her was on Wednesday night after Easter; "that he did not do anything, and that he was with her again on Sunday night (I think she said) and tried

it again. And then on the next Wednesday night she met him out there, and was out there about two hours, and he tried it a little, but she would not let him, as it was hurting, or something, and he did not do anything. Then on the next Saturday night she said she had intercourse with him. That was the second Saturday night after Easter Sunday.''

On cross-examination this witness testified that he was there to represent the three Watley boys, that the prosecuting witness did testify that the defendant was with her on Easter Sunday, and that he made a date to meet her out there on the following Wednesday night. Witness did not remember that she had said he tried it but once that night, and said that he did not have intercourse, but he tried to; that he would not be sure whether she said they met on the next Friday 'night or not, but thinks she did say she met him on that night, and that he tried to have intercourse with her; and the best the witness remembers she said it hurt, and he could not do it; that the witness understood that when he tried to put his privates in hers that it hurt, and that is the reason that he could not do it. And, ''Anyhow, I just asked her some more questions: asked her that if she meant by that that he got it in a little, and she said that it might have been, but she said, she still held out, that he didn't do anything until Sunday night, or Saturday night.'' Then on the next Sunday night, which was the third time, he tried to have intercourse with her again, and the best the witness remembered she said that at that time she did not let him at all. She would not let him try it because she was sore. Then on the next Wednesday night he tried it again, and she said he did not do it then for the same reason given before; that he could not; that it hurt her, and she made him quit. And witness believed on the Friday night following was when she said that he accomplished it fully. That they had intercourse at that time. On redirect examination the witness said that the day that he accomplished the act fully

was on her sixteenth birthday, but he don't remember the day of the week.

C. B. Cochran, one of the attorneys for the defendant, testified substantially as follows: That he was present at the examining trial, and heard Beulah Blankenship testify. That he made notes of her testimony, partly in shorthand and partly in longhand. That witness testified that defendant tried to have intercourse with her on Friday night after Easter Sunday, and again on the following Sunday night twice, and on the following Wednesday night, and that on neither of those occasions did he get it in, and that on Saturday night, that was the second Saturday night after Easter Sunday, that was the first time he did get it in. That the witness asked her at that time in specific language, referring to the Friday night immediately after Easter Sunday, "Did he get it in at all on that occasion?" and she said, "He tried to, but did not." And witness then proceeded to ask her through each occasion that he was with her, and she answered as before stated, and further said, "I did not know there was any blood on my clothes." On cross-examination witness testified that he did not take down all of her testimony; that she said that on Wednesday night after Easter he tried to get her to have intercourse with him, and she did not want to, and he did not make any promises as to what he would do if she would, and that on the Friday night following, and each of the other occasions that he met her after the first Wednesday night after Easter Sunday, that they got into position to have intercourse, and on direct examination she stated that it hurt her, and that on cross-examination stated that they did not succeed because they did not either of them know just exactly how to manage it; that the fifth time they attempted it, which was on the second Saturday night after Easter Sunday, 1918, was the first time that he succeeded in accomplishing the full act of sexual intercourse.

Leonard Marlow, defendant, testified that he was 18 years old on the 12th day of January, 1918. That he first met Beulah Blankenship along about Christmas, 1916. That he never was out with her at the gate or in the pasture at their place or at his brother's place during April, 1918. That he never had sexual intercourse with her at that time. The first time he ever had sexual intercourse with her was in the fall of 1918. That they were coming from church, and she told him that if he would wait out there she would come out, and they would go down into the pasture and have a time, and he asked her if she was not afraid of the old folks and she said, "No," she "had met boys out there before;" and he asked her who they were, and she said "L. J. Allen and that Boyngton boy," and that there "was somebody with him." She did not tell witness who. After L. J. Allen had gone to the army she said that if she knew where he was she would go to him. That was several months after witness had first had intercourse with her. It was along in the fall or winter of 1918. Witness denied ever being engaged to marry Beulah Blankenship. Witness denied that Beulah Blankenship had ever told him that she was in a family way. Witness said that he had asked her if there was anything the matter with her, and she said there was not. Witness denied that he had ever told Beulah Blankenship that she had better let Jerry Watley have intercourse with her at the time Jerry came up to where they were. On cross-examination, with reference to the time when the Watley boy came out to the pasture where they were, defendant testified that he had had intercourse with the prosecuting witness that night, and that they were sitting down talking, and that Watley came up and said, "What are you all doing?" and threw his coat down and said, "You step off." And defendant stepped off and stayed about five minutes, and Watley walked away and defendant came back and sat and talked with the prosecuting witness about 30 minutes and told her

he had to go. That this was about 11:30 at night. Then the following occurred:

"Q. Was that after she had become pregnant? A. Yes, sir.

"Q. She was already pregnant at that time? A. That is what—you mean that she was already in a family way?

"Q. Yes, sure. A. I don't know; she never did acknowledge to me that she was.

"Q. You stated just now that was after she had become pregnant, didn't you? You know what 'pregnant' means, don't you? A. Yes, sir.

"Q. You have known the Watleys for about 3 years? A. Yes, sir.

"Q. Where did they live from there? A. Who?

"Q. The Watleys? A. Which way did they live from her home?

"Q. From this place where he came up on you? A. He lived northeast.

"Q. About how far? A. About half a mile.

"Q. You never had told him that you was going to meet her out there that night? A. No, sir; I didn't tell him.

"Q. You never told him that you was meeting her out there at all, did you? A. No, sir.

"Q. How far did you live from her? A. I lived nearly a mile.

"Q. Do you know how he come to come up on you that night? A. No.

"Q. You don't know? A. No.

"Q. Did you ever ask him? A. No, sir; I never asked him.

Defendant further testified that it might have been the latter part of August or first of September, 1918, that he started to go with Beulah Blankenship. He admitted, however, that he was with her on Easter Sunday, 1918, but said he was only with her a short time on the way home from church, and that several other people were with him, all walking together; that he did not meet her, as she testified, on the occasions immediately after Easter; that he knows the Allen boy when he sees him, but he did not know where he was at that time; that she told him that she thought he had gone to the army, and that he had been away about 2 years. (As the trial occurred in October, 1919, this would put the Allen boy out of that country some time about the fall of 1917.) With reference to the time the defendant was with the prosecuting witness in the fall of 1918, at which time she said he had intercourse with her, he became considerably confused on cross-examination both as to the occasions and places where he met her and the months in which these occurrences happened. He said that he never solicited her to have intercourse with him, but that she voluntarily told him to wait out there for her, and that they would have a good time, without any solicitation on his part; and also voluntarily told him that she had been meeting other boys that way; that he never told the prosecuting witness that he loved her, nor never made love to her in any way, nor never promised to marry her, nor had never hugged and kissed her, nor had ever attempted to hug and kiss her before she asked him to wait for her; that on the first occasion when they did have intercourse they only did it once, and had no trouble with it; that was in September, 1918; that he is pretty sure that the baby is not his baby because he used a protection on all occasions except once or twice.

Minnie Marlow testified substantially as follows: That she is a sister-in-law of the defendant, and had known Beulah Blankenship 7 or 8 years; had gone to school with her; and

that Beulah always claimed to be just a little younger than the witness, and that witness was then 19 years old. She did not know exactly what Beulah's age was. That she claimed her birthday was in April. That in March, 1918, at the home of Mrs. Susan Watley, she heard Mrs. Blankenship (Beulah's mother), state that Beulah was 16 years old, and would be 17 next month. That in June, 1918, she had a conversation with Beulah Blankenship in which they were discussing improper conduct of girls, and Beulah stated that she did not think that there was any harm to have a good time with boys; that if she got into any trouble that she liked Leonard Marlow, and she was going to claim that he had gotten her into the trouble, because she understood that that would require him to marry her.

On cross-examination the following occurred:

"Q. Go ahead and tell all the conversation that you had with Beulah on that occasion. A. She was just talking about whether it was nice for girls to do that way.

"Q. Talking about what? A. Whether it was nice for girls to act that way.

"Q. Let's have what was said?

"The Court: Tell us the exact words she used to you, whether it is vulgar or not. Go ahead, tell the exact words.

"Witness: She was talking and she asked me if it was nice for girls to act like she was acting, and I told her no; that it was not.

"Q. Had she told you how she was acting? A. No, sir.

"Q. She hadn't told you? A. No.

"Q. All right? A. I said the way she had acted; she asked me was it nice for girls to act the way that she had acted, and I told her no, that it was not; I didn't think so; and she

said she thought it was; if anything ever happened to her, that she would lay it off on Leonard Marlow.

"Q. Why did she say that she would lay it off on Leonard Marlow? A. I don't know; I didn't ask her.

"Q. She said it was because she like him? A. Yes, sir.

"Q. She said, she asked you if you thought it was nice for girls to act like she had acted? A. No, sir; she didn't say that.

"Q. Well, what was it she did say? A. I told you that she said she asked me was it nice for girls to act the way that she was acting.

"Q. The way she had been acting? A. No, sir; she was acting now.

"Q. She asked you if you thought it was nice for girls to act the way she was acting or going to act? A. No, sir, she didn't.

"Q. Tell us what she did say. A. Well, I told you what she said.

"Q. Those are her exact words, 'Do you think it is nice for girls to act the way I have acted?' A. No, sir; no, sir; she didn't say that.

"Q. What did she say? A. Well, I told you.

"Q. Tell it again. Use the exact words that she said to you.

"The Court: Tell it again.

"Mr. Cochran: Go on and tell it again; tell all leading up to it.

"The Court: Tell us the exact words that she said to you.

"Witness: She was just talking, and asked me was it nice for girls to act wrong, and I told her no.

"Q. Is that what she said, for girls to act wrong? A. To do wrong.

"Q. To do wrong? A. Yes, sir.

"Q. That is what she said now, you say? A. (No answer.)"

This witness further testified as follows:

"Q. That was in June, 1918? A. Yes, sir.

"Q. Marlow had been going with her at that time, had he? A. I don't know.

"Q. They was sweethearts then, I believe? A. I don't know; I don't remember when he went with her.

"Q. She mentioned Leonard to you in that conversation? A. Yes, sir.

"Q. Now, you want us to know that you didn't know whether Leonard was going with her at that time; is that right? A. I don't remember whether he was or not.

"Q. Do you remember that he was not? A. Sir?

"Q. Do you remember that he was not? A. I don't know.

"Q. When was it he commenced going with her? A. Well, I don't know.

"Q. How far did you live from Leonard? A. I lived a long ways from him.

"Q. How far? A. Fifteen or 16 miles.

"Q. Did you live that far from him then? A. About half a mile.

"Q. How close did you live to this girl, Beulah? A. About a quarter of a mile.

"Q. You say that you don't know whether he was going with her then or not; is that right? A. I say that I don't remember whether he was. I think—I don't know whether he was or not.

"Q. Do you remember when he did commence going with her? A. (No answer.)

"The Court: Take your handkerchief out of your mouth, lady.

"Q. Do you? A. Well, different times.

"Q. Do you remember the occasion, what year it was? What year did he commence going with her? A. (No answer.)

"Q. He didn't commence going with her until September, 1918, did he? A. I don't know.

"Q. You don't know? A. No sir."

Redirect examination:

"Q. Did you ever see her going with him? A. I saw her follow around after him.

"Q. Did you ever see them out, go anywhere together, or see them in crowds occasionally? A. I seen them go to preaching over there one time.

"Q. Just one time? A. Yes, sir."

Recross-examination:

"Q. You have seen her following around after him, have you? A. Yes, sir; I have seen her running along after him.

"Q. Where did you see them running to? A. He was there at the house, and she was following him around.

"Q. He was at your house, and she was following him around? A. Yes, sir.

"Q. He was trying to get away from her? A. Yes, sir.

"Q. She was following around after him. A. Yes, sir.

"Q. That was in the daytime or nighttime? A. Day time.

"Q. Nineteen hundred and nineteen? A. Nineteen hundred and eighteen.

"Q. What time of the year was it? A. Well, I don't remember just what month.

"Q. Fall, spring, summer, or winter, Christmas season, New Year's or Thanksgiving, or when? A. (No answer.)

"Q. How many times did you ever see her tagging around after him?

"The Court: Let her answer the other question—what time of the year it was.

"Witness: It was in June or July.

"The Court: June or July of last year? Witness: Yes, sir.

"Q. June or July, 1918? A. Yes, sir."

Mrs. Susie Watley, as a witness for the defendant, testified that Mrs. Blankenship was at her house, and they were talking about the ages of the Blankenship children, and Mrs. Blankenship said that Beulah was 16 years of age and would be 17 in the following April. Witness did not fix the exact date of this conversation. On cross-examination the witness testified as follows:

"Q. Are you the wife of Jerry Watley? A. Yes, sir; I am.

"Q. You still live together? A. Yes, sir; we still live together.

"Q. How long have you known Mrs. Blankenship? A. Five years.

"Q. You don't know how old Beulah Blankenship is, do you? A. Only what they told me; that is what I know.

"Q. Who told you? A. Mrs. Blankenship and Beulah both. They both told me her age; yes, sir.

"Q. Mrs. Blankenship told you that she would be 17 her next birthday? A. Yes, sir.

"Q. When did this conversation occur? A. It occurred in March of last year.

"Q. At your house? A. Yes, sir; at my house.

"Q. What were you doing in March? A. I don't know.

"Q. What day in March? A. I don't know; I don't remember what day.

"Q. Who else was present? A. Minnie Marlow was there —well, the home folks. I don't remember whether any of the rest of them was at our house besides Minnie at the time she was there, or not.

"Q. You knew that Beulah's birthday was April 13th, didn't you? A. That is what they told me. I didn't know.

"Q. You hadn't known before that time? A. No, sir.

"Q. She told you that Beulah was 16 and would be 17 her next birthday? A. Yes, sir.

"Q. She said she would be 17 on the 13th day of April, 1918, didn't she; called it out that way? A. She said she would be 17 years old the 13th day of April, 1918.

"Q. I thought you said awhile ago that she said she would be 17 her next birthday? A. Her next birthday.

"Q. Now, what did she say? A. She said just what I said she did.

"Q. Which one of those statements did she make? A. She said she would be 17 years old her next birthday.

"Q. She didn't say then that she would be 17 on the 13th day of April, 1918? A. No, sir; she didn't make that statement.

"Q. She didn't say that? A. I didn't say that. You told me to say that.

"Q. No, I didn't tell you to say anything. I didn't know what you was going to say. A. I am telling all I know.

In rebuttal for the state Beulah Blankenship testified substantially as follows: She denied running around after Leon-

ard Marlow at Minnie Marlow's house as testified to by Minnie Marlow; also denied any conversation with the defendant in which she had ever told defendant that she had been out with L. J. Allen and the Boyngton boy, and that if she knew where Allen was she would go to him. She also denied first approaching the subject of sexual intercourse with the defendant.

McPherren & Cochran, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

MATSON, J. (after stating the facts as above.) It is first contended that the trial court erred in admitting over the objection of the defendant evidence of acts of sexual intercourse between the prosecuting witness and the defendant committed subsequent to the alleged acts relied upon for a conviction.

The state elected to rely upon an elleged act of sexual intercourse committed on the 5th day of April, 1918, and the prosecuting witness was permitted to testify that she and the defendant indulged in, under similar circumstances, frequent acts of intercourse at short intervals continuously from the date of the act relied upon up until the 3d day of February, 1919, and it is the evidence of the subsequent acts that is here complained of.

The decisions that evidence of acts of sexual intercourse, in a prosecution for statutory rape, committed prior to the act relied upon, is admissible, are practically unanimous. As to evidence of subsequent acts, the authorities are divided, but the trend of modern authority is to the effect that such evidence is admissible for the same reasons given in the decisions

admitting evidence of prior acts. The extent to which such testimony may be admitted must be determined by the trial court in the exercise of a sound discretion, and the evidence must have a legitimate tendency to show a lewd and adulterous disposition between the parties and must reasonably indicate the continuity of such lascivious disposition. Within such proper limitations such evidence has the same tendency, in our opinion, as evidence of prior similar acts to establish the guilty relations between the parties, the existence of a sexual passion between them, as corroborative of the ultimate fact sought to be proven; that is, the act of sexual intercourse relied upon for a conviction. Such has been the former holding of this court on this question, and we see no reason to divert therefrom at this time. Morris v State, 9 Okla. Cr. 241, 131 Pac. 731; Penn v. State, 13 Okla. Cr. 367, 164 Pac. 992, L. R. A. 1917E, 668; Taylor v. State, 14 Okla. Cr. 400, 171 Pac. 739.

It is also contended that the trial court erred in admitting testimony to show that subsequent to the offense for which the defendant was prosecuted the prosecuting witness became pregnant and gave birth to a child. The prosecuting witness testified that she and defendant quit meeting on February 3, 1919; that they had intercourse on that occasion, and that she was in a family way; that a baby was born to her on June 6, 1919, and that defendant was the father of the baby; that she did not become pregnant until in September, 1918. All this evidence was admitted over the objection and exception of defendant's counsel. We think that this evidence was competent as corroborative of the intimate relations existing and continuing between the parties. The weight of the evidence was for the jury.

It is also contended that the trial court erred in permitting the prosecuting witness to explain the particulars under which certain acts of intercourse with other persons occurred. In

this connection it must be noted that the defendant testified that he never commenced to have sexual intercourse with the prosecuting witness until in the latter part of August or the first of September, 1918. That was after the time, as the evidence discloses, that the prosecuting witness had reached the age of 16 years, and the defendant could not be convicted of statutory rape upon a female over the age of 16 years and under the age of 18 unless such female was of previous chaste and virtuous character. Having admitted his sexual relations with the prosecuting witness after she had reached the age of 16 years, the defendant, for the purpose of showing that he was not guilty of any offense under the law, asked the prosecuting witness on cross-examination if she had not committed acts of sexual intercourse with two other young men along about September, 1918, and the prosecuting witness replied that she had. On redirect examination the state sought to show the circumstances under which these other acts of intercourse were committed by the prosecuting witness, and the defendant objected thereto, which objection was overruled and exception taken. And the prosecuting witness was then permitted to explain that she and the defendant were in the pasture near her home about 100 yards from the highway between 11 and 12 o'clock at night; that she had had sexual intercourse with the defendant, and about the time the act was finished the other boy, who was a friend of the defendant, appeared upon the scene without any knowledge on her part, and remarked, "I have caught you, and you must do the same with me that you do with him;" and the defendant told her to "do it, or else they would be caught;" and that it was under such circumstances and at the defendant's solicitation and request that she had sexual intercourse with two other parties, who were brothers. While this evidence was immaterial and irrelevant either for the purpose of establishing the guilt or innocence of the defendant of the particular act of sexual inter-

course alleged to have been committed with the prosecuting witness on the 5th day of April, 1918, still it was a matter that was brought out in the cross-examination of the prosecuting witness by defendant's counsel.   After having elicited this particular evidence for the purpose of besmirching the character of the prosecuting witness, the defendant will not be heard to complain in this court of the action of the trial court in permitting the prosecuting witness to explain her conduct on such occasion.

It is also contended that the trial court erred in failing to instruct the jury specifically as to the purpose for which evidence of subsequent acts of intercourse were admissible.   No request was made for any such instruction.   The trial court gave an instruction as follows:

"You are instructed that the state has elected to stand upon the occurrence of April 5, 1918; and, unless you believe beyond a reasonable doubt that at that date the said Beulah Blankenship was under 16 years of age, and believe further that on that occasion the defendant succeeded in penetrating the private parts of said Beulah Blankenship, you should acquit him.   But in this connection you are instructed that sexual penetration, however slight, is sufficient to meet the requirements of the law as to penetration."

In the absence of any request for a more specific instruction on the subject, we believe the foregoing instruction to have been sufficient to safeguard the substantial rights of the defendant, and did prevent his conviction upon evidence of any alleged act of sexual intercourse between him and the prosecuting witness, except the act alleged to have occurred on April 5, 1918.

The judgment is affirmed.

DOYLE, P. J., and BESSEY, J., concur.