## J. C. Escobar v. The State.

No. 14897.  Delivered April 20, 1932.
Rehearing Denied June 15, 1932.
Reported in 51 S. W. (2d) 346.

The opinion states the case.

*Kilday & Howard,* of San Antonio, for appellant.

*Walter Tynan,* District Attorney, of San Antonio, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for forty years.

Appellant shot and killed his father-in-law, Thomas Donovan. On the day before the homicide appellant and his wife had a quarrel, the result being that the wife went to her sister's home. After the quarrel, deceased, who lived with appellant and his wife, went with appellant's wife to her sister's home. Mrs. Salazar, who is the sister of the appellant's wife, her children, deceased and Frank Salazar were present in Mrs. Salazar's home when appellant came at night for his wife, who had retired for the night. Appellant tried to get her to dress and return to their home with him. According to the version of state's witnesses, appellant approached his wife's bed, turned a flashlight on her, and demanded that she return home with him. At the time of making this demand, appellant placed his hand on his right hip and cocked his pistol. His wife did not answer him. Mrs. Salazar interfered, telling appellant that his father-in-law was coming into the room. Appellant then went into the yard. As appellant left the house, deceased stated to him that he would meet him at the courthouse on the following day. Appellant invited deceased outside, saying: "Come out, you dirty s— of a b—." According to appellant's version, he had no gun when he went to his

wife's room, and made no demonstration toward his wife. Appellant testified that, as he left the house, deceased threatened to kill him, saying: "Let me get out and I will kill him." Appellant, as well as his wife, who testified for him on the trial, denied that appellant was guilty of any unbecoming conduct while in Mrs. Salazar's home.

The homicide occurred at half past six o'clock in the morning after appellant was in Mrs. Salazar's home. Deceased was walking on a sidewalk. Appellant, accompanied by another man, drove down the street, and pulled his car into the curb near deceased. Several witnesses for the state, who were not related to the parties, saw appellant fire the fatal shots. These witnesses testified, in substance, that as appellant slowed up his car near the curb he fired a shot at deceased with a pistol; that deceased was in the middle of the sidewalk; that appellant fired two more shots and deceased sank to the sidewalk; that deceased was unarmed. These witnesses further testified that the deceased was making no demonstration toward appellant, and was not close to appellant at the time the shots were fired. One of the witnesses testified that he went to the body of deceased immediately after appellant fired the fatal shots, and that he saw no weapon of any kind or character in the hands of deceased or in the vicinity of his body. He said that immediately after appellant killed deceased he (appellant) left the scene of the homicide.

Appellant testified, in substance, that he was driving along the street when he met deceased; that he stopped his car and asked deceased if he wanted to take him home; that deceased cursed him, saying: "You s— of a b—; here's where I wanted to catch you, and I'm going to kill you"; that deceased got on the running board of the car with a knife in his hand, and began cutting at him; that the knife that the deceased was holding in his left hand had a blade about three inches long; that he struck deceased with his pistol, but was unable to stop his attack; that he then shot deceased one time, but this did not stop his attack on him; that he fired two more shots at deceased; that deceased then stepped off the running board and went to the back of the car; that he did not see deceased fall; that he went from the scene of the homicide to the jail and surrendered. Appellant further testified that he had been advised that dceased had threatened to kill him. He introduced witnesses who supported his testimony as to threats on the part of deceased. Appellant's witness Dias, who was in the car with appellant when he shot deceased, gave testimony substantially the same as that of appellant.

Appellant alleged in his first application for a continuance that he was not ready for trial on account of the absence of Consuela Falcon. For diligence it was averred in the application that appellant made application for a subpoena for witness on May 27, 1931; that a subpoena was issued by the clerk and thereafter returned by the sheriff, showing that the witness had not been served, for the reason that he had moved and could

not be found; that on the 9th day of June, 1931, appellant procured the issuance of another subpoena for the witness, which was returned by the sheriff without being executed, for the reason that the witness had moved away and no one knew his whereabouts. Touching the materiality of the testimony the witness would give, it was alleged in the application that the witness would testify that the deceased on numerous occasions expressed his bitter hatred for appellant, and told the witness that he desired to be rid of appellant. Further, it was alleged that on numerous occasions during a period of approximately two or three years to the death of deceased, he (deceased) had threatened to take the life of appellant or do him serious bodily injury. It was averred in the application that the witness would testify that he communicated these threats to appellant prior to the homicide. Appellant attached the affidavit of the absent witness to his motion for new trial. In the affidavit it was stated, in substance, that in December, 1929, deceased told the witness that he was going to kill appellant; that he did not like him; that the witness communicated this threat to appellant. The court qualified the bill of exception (No. 1), relating to the refusal of the continuance and the overruling of the motion for new trial in so far as same was based on the refusal of the continuance in the first instance, as follows: "This testimony upon which the motion for continuance was sought is of a threat made on the life of the defendant in December, 1929. Dorotea Praeto testified at the trial that deceased threatened the life of defendant about May 10, 1930, on month before the killing."

The homicide occurred on the 20th day of June, 1930. Appellant was immediately arrested. The indictment was returned August 29, 1930. Application for process was made for the first time on the 27th day of May, 1931, which was approximately nine months after the return of the indictment. The burden was upon appellant to affirmatively show that he used all the diligence required by law to secure the attendance of the absent witness. Branch's Annotated Penal Code, sec. 314; Boyd v. State, 57 Texas Crim. Rep., 647, 124 S. W., 651. The opinion is expressed that appellant failed to use the diligence demanded by the law. He showed no facts excusing the want of diligence. He did not promptly resort to the means provided by law for obtaining the absent testimony. On the contrary, he waited approximately nine months after the return of the indictment before he applied for process for the witness.

Notwithstanding the fact that the absent testimony should be held to be material, it does not necessarily follow that a new trial should have been granted. It is true that the trial judge's discretion to determine the probable truth of the testimony of the absent witness did not operate, in view of he fact that his affidavit, in which it was shown that he would testify to the facts averred in the application for continuance, was attached to the motion for new trial. Wiley v. State, 117 Texas Crim. Rep., 449,

36 S. W. (2d) 495; White v. State, 90 Texas Crim. Rep., 584, 236 S. W., 745; Cruz v. State, 100 Texas Crim. Rep., 188, 272 S. W., 486; Tubb v. State, 109 Texas Crim. Rep., 458, 5 S. W. (2d) 150. The fact, however, that the trial court had no discretion to determine the probable truth of the testimony did not necessitate a new trial unless the materiality of the absent testimony was such as that, if true, it would likely produce a different result upon another trial. White v. State, supra; Wiley v. State, supra. Moreover, it would not necessarily result in the granting of a new trial when there was other evidence cumulative of the absent testimony present or available to the appellant so that it reasonably appeared that no injury resulted in the absence of such testimony. White v. State, supra; Wiley v. State, supra; Walton v. State, 116 Texas Crim. Rep., 20, 34 S. W. (2d) 598. Conceding the truth of the absent testimony, the question is whether, viewed in the light of the facts adduced upon the trial, it is of such materiality as that it would likely produce a different result upon another trial. As qualified by the court, the bill of exception discloses that another witness testified on the trial that deceased threatened the life of appellant about one month before the homicide. Again, the witness who was in the car with appellant when he shot deceased testified to facts supporting appellant's theory that he acted in self-defense. Having the testimony of appellant and this witness before them, as well as the testimony of the witness to the effect that the deceased had threatened to kill appellant a month before the homicide, the jury concluded that appellant did not act in self-defense. In the light of the evidence, we are unable to reach the conclusion that proof of another threat made some six months prior to the homicide was of sufficient materiality to necessitate the granting of a new trial. The learned trial judge concluded, after hearing all the testimony and taking into account the fact that the absent testimony was cumulative, that its production upon another trial would not likely produce a different result. The opinion is expressed that in overruling the motion an abuse of discretion is not shown.

Bills of exception Nos. 1 and 2 present the following occurrence: After the homicide, appellant's wife went to the district attorney's office with her sisters and made a statement to Mr. Flores, an investigator for the district attorney. Appellant did not send her to the office, and she was not summoned or requested to appear there by the district attorney or any other officer. Touching her reason for being in the district attorney's office, appellant's wife testified, in the absence of the jury, as follows: "I happened to be in the district attorney's office at that time because all of my sisters went over there. My sister told me to go there. As to what she told me about going there, she told me to make that statement. I saw Mr. Flores when I went up there. He told me that my statement was not good, that I couldn't testify against him. He said I had to make a statement. I did not know whether Mr. Flores was an officer or not.

As to whether or not I did believe that I had to make a statement at that time, yes sir; I believed I had to make that statement. Yes, sir, that is the reason I talked to him and made the statement."

After appellant's wife had testified on her direct examination before the jury to the effect that deceased was in the wrong in the quarrel with appellant on the night preceding the homicide, and, further, that appellant made no demonstration toward her with a pistol, as testified to by witnesses for the state, the district attorney asked her, on cross-examination, the following question: "I will ask you whether or not at the time you told your story to Mr. Feliciano Flores you didn't make this statement: 'I do not know what·time it was when I woke up and the reason I woke up is because my husband flashed a light in my face and shook me by my leg and told me, "Get up—let's go." I did not answer him but I sat up in the bed and did not say anything to him because I saw that he had his hand on his right hip and thought he had his hand on his gun because he always carried a gun on his right side and being that when he left my house he left with his gun?' "

Over appellant's objection, the witness answered in the affirmative, but said that the statement she made to Mr. Flores was untrue. Further, the witness testified on cross-examination, to the effect that she stated to Mr. Flores that deceased told appellant at the time in question that he would meet him at the courthouse, and appellant replied: "Get out, you dirty s— of a b—." This statement was directly contradictory of the testimony given by the witness on her direct examination by appellant. Appellant also objected to this statement. The objections in each instance were that the state was attempting to impeach appellant's wife by a statement made out of the presence and hearing of appellant; that the statement was not voluntary; that the state was, in effect, using the wife as a witness against the husband.

That the wife may be impeached by proof of contradictory statements made to third parties as to material matters inquired about on her direct examination is well settled by the decisions. Rodgers v. State, 91 Texas Crim. Rep., 38, 236 S. W., 748. Stated in another way, the wife may be impeached by showing declarations made by her to a third party which are contrary to her testimony upon the witness stand, if pertinent to the examination in chief. Where a wife testifies before the grand jury voluntarily and at the instance of her husband who may be under investigation, the declarations made to the grand jury, if contrary to her testimony given upon the trial of the case, and pertinent to the examination in chief, may be proven for the purpose of impeachment. Rodgers v. State, supra. If the wife is taken by process before the grand jury and made to testify, her statements there cannot be proven for impeachment purposes, even though pertinent to the examination in chief. Rodgers v. State, supra; Doggett v. State, 86 Texas Crim. Rep., 98, 215 S. W., 454; Johnson v.

State, 66 Texas Crim. Rep., 586, 148 S. W., 328. The rule last mentioned has been applied by this court to declarations made by the wife to a justice of the peace, sitting under the authority of the statute for the purpose of investigating violations of the law. Turner v. State, 89 Texas Crim. Rep., 615, 232 S. W., 801.

Appellant contends that the present case differs from the cases to which reference has been made in the fact alone that the statement involved here was made to the district attorney's investigator in his private investigation of the case, while in the other cases the declarations were made before the grand jury or a justice of the peace sitting as a court of inquiry. Other distinguishing elements are deemed to be present. Appellant's wife was not required by the district attorney to come to his office for the purpose of making a statement to the investigator. No agency of the state was responsible for her presence there. In the cases relied upon by appellant, agencies duly constituted by law to investigate crime brought the wife before them as a witness under process, which the law required her to obey. If it be correct to say that she could not be compelled to testify after appearing in response to a summons by the grand jury, we know of no case holding that she would not be subject to the same penalties for disobeying a subpoena of the grand jury as would any other witness. Be that as it may, the state, through an inquisitorial body generally empowered to investigate violations of the law, and, for that purpose, to require witnesses to appear, and, with certain exceptions, to testify concerning matters under investigation, initiated the proceeding resulting in the declarations of the wife against her husband. In the present case, as heretofore stated, no agency of the state was responsible for the presence of the wife in the office of the district attorney. She went there, according to her testimony, to make a statement about the trouble between appellant and her father. Under the circumstance, in so far as it relates to the admissibility of the proof of the declarations, the fact that the investigator might have told her that she had to make a statement is deemed immaterial.

Article 1223, Penal Code, provides: "When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapon or means used by the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

The court's charge on the provisions of the foregoing article was as follows: "You are further charged that in law a person is presumed to have intended the reasonable and probable consequences of his acts. Therefore, if the deceased, Tom Donovan, made an attack upon the defendant with a knife and the character of the knife or the mode and manner of its use, was such as would be calculated to produce death or serious bodily

injury, then the defendant in such case would have a right to presume that the deceased, if he did so use such knife, intended to cause death or serious bodily injury to the defendant."

The chief objections leveled at the charge were that it failed to advise the jury that the law presumed that deceased intended to inflict death or serious bodily injury; that it failed to make any application of the doctrine of reasonable doubt; and that nowhere therein was the jury informed of the right of appellant "to act on the presumption arising in the event it reasonably appeared to the defendant that the weapon used was such as was reasonably calculated to produce death or serious bodily injury."

Adverting to the first exception to the charge, it was said by this court in Gaither v. State, 109 Texas Crim. Rep., 154, 3 S. W. (2d) 814, in effect, that where the evidence raises the issues of the use of a deadly weapon by the deceased, it is an absolute presumption imperative to juries, as well as courts, that the deceased designed to inflict the injury mentioned in article 1223, Penal Code, and, further, that the provisions of the article must be given in charge to the jury. In Carter v. State, 97 Texas Crim. Rep., 508, 262 S. W., 79, this court, in referring to the article under consideration, said: "We have held in many cases that, if the facts show an attack with such weapon, the trial court should give in charge the substance at least of said article." To the same effect are many other decisions of this court, some of which are cited in Holland v. State, 112 Texas Crim. Rep., 164, 15 S. W. (2d) 626. It is observed that the court advised the jury in the first part of the charge on article 1223, that in law a person is presumed to have intended the reasonable and probable consequences of his acts. The instruction that appellant had a right to presume that the deceased intended to cause death or serious injury was sufficient, in our opinion, when considered in connection with the first part of the charge to which we have referred. It is not reasonable to conclude that the jury did not understand from the charge that the law presumed that deceased intended to kill appellant if he was attacking appellant with a deadly weapon. In any event, if the charge is inaccurate, the opinion is expressed that under the provisions of article 666, C. C. P., we would not be warranted in ordering a reversal. Appellant testified, in part, as follows: "That knife had a blade about three inches. He was cutting at me and I slipped over to the other side of the seat. That put me on the right hand side of the car. That when I couldn't do any more; he was cutting at me and I couldn't do any more, then I grabbed his hand when he was passing at me with the knife and stooped down and under the dash board—that model car had a side pocket—and I had a gun in there and I hit him across the left side, across here, the face. Then he kind of went back a little bit and come back again this way; like this (indicating) inside the car. Then is when I had to shoot. I shot him once but he did not stop coming. He came

back at me again. Then I shot two more shots. Then he stepped off the running board and went to the back of the car. I did not see him fall. I did not shoot at him any more after he quit cutting at me."

Appellant's witness Dias gave testimony substantially the same as that of appellant. If the jury had believed appellant's testimony, is the conclusion reasonable that they would not have found, under the charge in question, that deceased intended to kill appellant or inflict serious bodily injury on him? We are constrained to believe that, under the facts reflected by the record, the charge as framed could not have misled the jury.

Touching the next exception, appellant cites Johnson v. State, 67 Texas Crim. Rep., 441, 149 S. W., 165, 169. In that case the deceased was an officer. He was armed with a pistol when killed by Johnson. No witness testified that the deceased had a pistol in his hand during the fatal difficulty. However, the circumstances indicated that he might have had a pistol in his hand, for, according to the testimony of some of the witnesses, a pistol was dropped on the gallery as the deceased backed away. This pistol was identified as being the one carried by deceased. In discussing the charge covering the provisions of article 1223, Penal Code, this court said: "Where the court instructs the jury, 'and if the weapon used by him, and the manner of its use, were * * * calculated to produce death or serious bodily injury,' should have been followed by the words, 'or it reasonably so appeared to defendant,' or words of similar import. Deceased was an officer, and he had a right to have a pistol, and the fact he did have one, unless he in some manner attempts to make use of it, would not raise any presumption."

The facts in the present case are clearly distinguishable from those in Johnson's case. Here deceased was not an officer. According to appellant's version, he was making an actual attack on him with a knife whose blade was three inches in length. He made repeated attacks on him, according to appellant's testimony, cutting at him with the knife. The necessity, under the facts, of embracing in the charge the words "as it reasonably so appeared to defendant" is not perceived. In any event, the omission was not, in our opinion, calculated to injure appellant. Hence under the provisions of article 666, C. C. P., we would not be warranted in concluding that reversible error appears.

The court, in charging on self-defense, coupled therewith the doctrine of reasonable doubt. Appellant cites no authority, and we know of none, holding that notwithstanding the fact that reasonable doubt is charged in immediate connection with the instruction on self-defense, and also in regard to the whole case, the failure to further couple the reasonable doubt with a charge on article 1223, supra, is reversible error. We are constrained to overrule appellant's contention that the matter presents reversible error.

In his argument to the jury, the district attorney, as shown by bill of exception No. 7, used language as follows: "If Tom Donovan was a man just dying to kill Joe Escobar and with the recent trouble between Joe and his wife and Joe came to the house of Salazar, a relative of Tom Donovan, he could have killed Joe Escobar and he would have been justified."

Appellant objected to the argument on the ground that it was not supported by the evidence and was the unsworn testimony of the district attorney, and was calculated to lead the jury to believe that deceased, Tom Donovan, had a legal right to kill appellant. The bill fails to set out the circumstances attendant upon appellant's visit to the home of deceased's relatives. The circumstances may have been such as would have, under the law, justified deceased in killing appellant at the time of such visit. Hence we are unable to say that the argument was improper.

Appellant's motion for new trial was, in part, predicated upon alleged newly discovered evidence, it being averred therein, in substance, that Joe Ramirez would testify that he lived near the scene of the killing and went to the body of deceased after he had fallen to the sidewalk; that four or five days after the homicide his daughter, Esther Ramirez, who was about eight years of age, reported to him that she had seen a knife near the sidewalk where deceased was killed; that he went to the place and found an open knife with a blade about three inches long; that the knife was in some weeds about twelve feet from the place where he had seen the body of deceased; that he did not report the matter to appellant or his counsel, not knowing that any claim would be made that a knife was used in the difficulty; that after the trial he read in the paper that appellant defended on the ground that deceased was attacking him with a knife; that thereafter he mentioned the matter of the knife to an attorney; that, excepting his wife, he had not told any one prior to that time that he had found the knife. The court heard testimony when the motion was presented. The witness testified, in substance, on the hearing that he had known appellant for several years; that there was one house between his house and the place where deceased was killed; that he had lived in that place about twelve years; that it was near the home of the Salazar's, who were relatives of the wife of appellant; that after the homicide he went to the body of deceased; that four or five days after the homicide his little daughter advised him that she had seen a knife near the sidewalk; that he went to the place and procured the open knife; that he closed it and carried it home; that thereafter he carried it to his place of business; that in some manner unknown to him his wife got possession of the knife and took it to her mother's house; that the knife was in the same condition as it was when he picked it up; that the knife produced in court was the knife he had found; that the knife was about twelve

feet from the place where deceased had fallen; that he did not tell appellant or his counsel about finding the knife; that they had at no time interviewed him concerning any knowledge he had of the transaction resulting in the death of deceased. At this point we quote the testimony of the witness as follows: "Joe Escobar (appellant) never did come and ask me what I knew about the case. None of his lawyers ever came. The first man who came to me was Mr. Joe Flores. That was after I talked to Mr. Monroe. * * * Up until the time when I told Mr. Monroe about it I never discussed it with anybody."

The witness testified, further, that he did not discuss the matter with anybody because he did not want to be involved in the case. We quote further from the testimony of the witness, as follows: "I don't think I kept it at the house a week, but I put it in my pocket and took it down to the garage. My wife got hold of it. I don't know how she got hold of it. I took it to the garage and after that my wife got hold of it. I don't know where she got it from. I don't remember putting it any place in the garage but later on my wife got hold of it. When Mr. Flores came after the knife I told him my wife had it. I knew my wife had it because she told me. She told me she had it after the trial. I asked her and told her about the knife and she said she had the knife. I don't know how she got hold of it. Then I took Joe Flores over to my mother-in-law's where the knife was. My wife had the knife at her mother's. She had not given it to her mother but she left it there in a drawer. My wife's mother had the knife when I finally located it, and I took Mr. Joe Flores over there."

The daughter of the witness was not called by appellant. Appellant did not testify on the hearing of the motion. Although deceased lived in the appellant's home, appellant did not undertake to identify the knife or testify that he had ever seen it in deceased's possession. Raymond South, a witness for the state, testified as follows: "I know one color from another color. As to what, in my opinion, the color of this knife is, in the first place it is a bone handled knife and it is burnt. In my opinion it has a bone handle burned black. The color on there is caused by burning that bone. The predominant color of that knife as a whole is black. The long blade doesn't seem to be rusty at all. It is not rusty at all. The hinge works easily on the big blade. There is no obstruction at all. The smaller blades give some evidence of being rusty down around the hinge. That is very little. Inside the slot where those blades fit when closed there is a metal strip on the inside at the bottom and that is still bright and is not rusty. I said this knife was burned black, and that that was the result of burning. I never did do any work of that kind, but I know a little something about knives. There is a brown hue to that knife down in here but the predominant color is black. The hue of that knife is black and not brown. Down here at

the edge where the bone wasn't burned it is still kind of a light color. The predominant color is black. My testimony is that it is black and does not have a brownish hue."

The homicide occurred on June 20, 1930. Touching the condition of the weather from June 20th until June 25th, the following agreement was made between counsel for the state and appallent: "It is agreed that were F. H. Marks present—who is not now available as a witness, being off duty—he would testify that on the morning of the 1st of July, 1931, he was requested by C. J. Matthews to look up the government weather report for the rainfall from the 20th of June to the 26th of June, 1930, and that he reported over the 'phone that on the 20th there was no rain; that on the 21st or the 22nd, it commenced raining in the night and rained .11 of an inch; the 23rd was clear; the 24th about five o'clock in the morning there was a light shower, which was not sufficient to measure. It was agreed that that was the weather bureau report and that he would testify to those facts if present."

The opinion is expressed that appellant failed to use the diligence demanded by the law. Although he knew the witness Ramirez, he made no effort at any time to question him concerning his knowledge of the transaction resulting in the homicide. The witness testified that he had gone to the body of deceased immediately after the homicide. It was incumbent upon appellant to make diligent effort to determine the names of the persons who were at the scene before or shortly after the homicide. He knew that the witness lived within a few yards of where he shot deceased, yet he at no time made an investigation to determine what the witness knew about his case. Being of the opinion that appellant failed to show that it was not owing to the want of diligence that the evidence in question was not discovered sooner, we are constrained to hold that the trial judge was warranted in overruling the motion for new trial. Arnold v. State, 115 Texas Crim. Rep., 189, 29 S. W. (2d) 762.

The testimony heard by the trial court, in the light of the facts proved on the trial, in our opinion, warranted the conclusion that the alleged newly discovered evidence, if before the jury, would not probably result in a verdict more favorable to appellant. Notwithstanding the fact that the proof showed that it had rained on two occasions since the homicide and prior to the day the witness found the knife, the blade claimed by the witness to have been open was not rusty. Again, the testimony of the state was to the effect that the handle had been burned and did not have its natural color. If it should be conceded that the testimony of the witness that he found the knife was true, it does not follow, under the evidence heard by the trial judge, that he was without discretion to determine that the knife found had not been in the possession of deceased on the occasion of the homicide. The fact that appellant made no effort to identify the knife as belonging to deceased, though deceased

lived in his home, and that the knife was not rusty, although it had been in the rain, and the further fact that there was evidence that the handle had been burned, would have warranted the trial court in concluding that the knife found by the witness was not that of deceased. See Branch's Annotated Penal Code, sec. 201; Garza v. State, 65 Texas Crim. Rep., 476, 145 S. W., 591.

Failing to find reversible error, the judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant urges three matters in his motion for rehearing: (1) That we erred in permitting the state to prove, for the purpose of impeaching appellant's wife who was a witness in his behalf, certain written statements made by her to an investigator in the district attorney's office in San Antonio; (2) that the charge of the court was erroneous in not giving to the jury the language of article 1223, P. C., stating the presumption arising from the use of a deadly weapon; (3) that we erred in not holding that it was reversible error for the trial court to refuse a new trial sought because of newly discovered evidence.

As we understand appellant's complaint regarding the impeachment of his wife, he insists that unless it be shown that said wife went to the office of the investigator, and made the statement there made by her, at the instance of or with the consent of appellant, same should not be held provable against her for impeachment purposes. No new authorities are cited by appellant in his motion. In the cases of Johnson v. State, 66 Texas Crim. Rep., 586, 148 S. W., 328; Doggett v. State, 86 Texas Crim. Rep., 98, 215 S. W., 454; and Turner v. State, 89 Texas Crim. Rep., 615, 232 S. W., 801, relied on by appellant,—the wife of the accused was in each instance brought before the grand jury or some other inquisitorial authority by process or summons for the purpose of there being questioned, under which circumstances we have held her statements not usable for impeachment purposes. In the original opinion it is shown how on the facts this case is differentiated from those mentioned. Having gone voluntarily to the district attorney's office with her sister, and having there made a statement which she repeatedly said on the witness stand she had made, we find ourselves unable to assent to the soundness of appellant's contention that such statement could not be used for purposes of impeachment. To otherwise hold would guarantee to the wife of one who testified for him immunity against impeachment by proof of prior statements made by her at variance with her testimony,

unless it could be shown that she made them at the instance or request of her husband; a matter practically impossible of proof. The prime object of every trial in a court of justice ought to be the ascertainment of truth and its application in any given case. We apprehend a rule such as is contended for by appellant would much handicap the state and greatly encourage the making of false statements by the wives of men engaged in criminal pursuits.

The court's charge on the presumption arising from the use of a deadly weapon is quóted in our opinion, and appears to be a concrete statement of the law as applied to the facts in the instant case. We are unable to see how appellant could have profited by the giving in charge of the abstract legal proposition contained in article 1223, P. C., when its principle was in the charge of the court put before the jury as an application of said principle to the facts. We are by statute forbidden to reverse cases for errors in charges unless such error be calculated to injure the rights of the defendant, or to prevent a fair and impartial trial. Article 666, C. C. P. We fully appreciate what was said by this court in Kendall v. State, 8 Texas App., 569, but are of opinion that the "imperative presumption" therein mentioned was given in charge to the jury in this case in its full force and effect. We do not think there was any error in the charge, but if there was, then article 666, supra, would operate to prevent a reversal of the case.

In passing on the refusal of a new trial because of newly discovered evidence in our former opinion, we disposed of same upon the ground that appellant had exercised no diligence. In determining whether there be an abuse of discretion by the trial court in refusing a new trial under such circumstances, both the alleged newly discovered evidence and that heard on the trial become especially important in solving the question as to the likelihood vel non of a different result if the alleged new evidence be put before a jury. The entire improbability of a different verdict being brought about by the introduction of evidence, in effect, that in some weeds twelve or more feet from where appellant's witnesses claimed deceased fell after being shot by appellant, a knife was found some four or five days after the homicide, and after state witnesses had testified that they looked the ground over and found no weapon, seems easily demonstrated by a review of the facts.

State witnesses wholly without interest or bias testified that deceased was walking west on Ruiz street; that appellant and another man in a coupe were going east on the same street, and when nearly opposite where deceased was the coupe swerved over to that side of the street upon which deceased was walking, and three shots were fired by appellant. These witnesses disclaim any offensive act on the part of deceased, or any attack upon appellant, or effort on the part of deceased to get in the car of appellant. Appellant and the man in the car with him swore that

deceased got on the running board of their car, that appellant was alone in the front seat of said car, that deceased reached through the window of the car with both hands, grabbing and stabbing at appellant, then thrust the upper part of his body into the car and was reaching for and stabbing at appellant when the latter got out of a pocket of the car a pistol and fired three times at deceased. The materiality of the finding of the knife, as above mentioned, could only arise in case there be some probability of the truth of this story told by appellant and his witness.

The testimony of the undertaker,—not disputed or called in question in any way,—seems to demonstrate beyond doubt the falsity of the testimony of said parties. Ortez, the undertaker, swore that there were eight bullet wounds in the body of deceased; two resulting from the entry of a bullet on the left side and slightly to the front of the body, the exit wound of which was in the same direction and slightly to the rear of the body on its right side; two of the wounds were caused by the entrance of a bullet just above the one mentioned, entering on the right side slightly to the back and making its exit on the opposite side slightly to the front; four of the wounds,—made by the same bullet,—which bullet entered the *left* arm of deceased about four inches below the left shoulder, passed through the arm and out on its side next to the body, entered the body exactly in correspondence with the last exit wound referred to, and come out slightly to the right of the center of the body between the third and fourth rib. Little analysis would be needed to make plain that these mute wounds speak volumes in establishing the falsity of appellant's claim and the impossibility of the infliction of such wounds upon a man whose body was thrust through the window of a car and whose hands and arms were outstretched to stab a man who said he drew away as far as he could and then fired three shots at deceased who was stabbing at him with a knife in his outstretched left hand. We think the trial judge well within his discretion in concluding that the testimony of Ramirez that he found a knife, where others found none, would not have caused the jury to accept appellant's story of the killing.

The motion for rehearing will be overruled.

*Overruled.*