[Civ. No. 5261. Third Appellate District.—March 22, 1935.]

LESTER P. AGOURE et al., Appellants, v. SPINKS REALTY COMPANY (a Corporation) et al., Respondents.

Frances D. Adams and Robert Clifton for Appellants.

Barker & Keithly and Barker, Smiley & Keithly for Respondents.

WOODWARD, J., *pro tem.*—Plaintiffs appeal from a judgment for defendants in an action to enjoin the sale of real property pursuant to the terms of a deed of trust, and to recover money alleged to have been paid as usurious interest.

Certain acts of the parties culminating in the present controversy are not in dispute and may be chronologically outlined as follows: On May 16, 1923, the plaintiffs, Lester P. Agoure and Frances Lea Agoure, husband and wife, borrowed $20,000 from Mosely E. Spinks, giving their promissory note therefor secured by a deed of trust on certain real property situated in Los Angeles County. Three years thereafter the note matured and, by mutual consent, the due date thereof was extended until November 16, 1928. On November 14, 1929, the plaintiffs being in default both as to principal and interest, Mosely E. Spinks recorded a notice of default. His death occurred three days later and the ownership of the note and deed of trust passed to his family, subject to administration of the estate. Decedent left a will wherein Clara B. Spinks, surviving widow, was named as executrix and Andrew M. Spinks, Leon P. Spinks and John W. Spinks, surviving sons, as executors. The widow declined to act and by reason thereof the responsibility of probating the estate devolved upon the sons who, in due time, proceeded to complete the foreclosure initiated by their father.

On March 18, 1930, the trustee sold the property in the usual manner and it was bid in by the Spinks Realty Company, a family corporation previously organized by decedent, for $24,914.93, which said amount was the aggregate of principal, accrued interest, certain advances and costs of sale. A check for the full amount of the bid was issued by the realty company, delivered to the trustee and, in due time, credited to the funds of the estate. On the same day but after the foreclosure sale the Spinks Realty Company sold the property back to plaintiffs for $30,000. taking their promissory note, secured by a deed of trust on said property, for the full purchase price. The note was to mature on March 18, 1933, and bore interest at the rate of eight per cent per annum. Plaintiffs thereafter defaulted in the installment of interest due on December 18, 1930, whereupon the Spinks Realty Company gave notice that, in accordance with the terms of the note, it had elected to declare all sums secured by said deed of trust to be immediately due, and proceeded to take the customary steps for the sale of plaintiffs' property. Plaintiffs then commenced the present action, alleging in their complaint that

the resale of the property to them by the Spinks corporation was an unlawful subterfuge, the real purpose being to renew the original loan at an usurious rate of interest. They prayed for a money judgment of $3,600, or treble the sum of their installment payments to date; they also sought and, on July 9, 1931, obtained an injunction *pendente lite*.

It may be observed parenthetically that the procedural regularity of the completed foreclosure was not attacked at the trial, the court having been called upon to determine but one issue of fact, namely, whether the resale was a *bona fide* transaction, or merely a prophylactic attempt by the Spinks brothers to avoid future complications. On the issue of fact thus presented, the court found against plaintiffs' contentions, holding that the resale was legitimate and regular in all respects; that after the foreclosure had been completed the "defendant Spinks Realty Company offered to sell and transfer the property acquired by it at said sale to plaintiff Lester P. Agoure at and for the price of $30,000, which was then and there accepted by said Lester P. Agoure, and it was to evidence such transaction, to-wit: a sale of said real property, that said agreement constituting the escrow instruction, Exhibit A, attached to the complaint, was made, and it was in consummation of said purchase and sale that said $30,000 promissory note was executed".

An exhaustive discussion of the evidence is not necessary, a *résumé* thereof being sufficient. Generally speaking, the plaintiffs charged that there had been a categorical agreement with the three Spinks brothers for a renewal of the $20,000 obligation under the guise of a foreclosure and resale of the property. Plaintiff Lester P. Agoure testified that, after learning of the notice of breach and the subsequent death of Mosely E. Spinks, he conferred with his attorney, Mr. Taggart, and then, accompanied by Mrs. Agoure, went to the office of the Spinks Realty Company to see if the sale could not be postponed. This was about the middle of February, 1930; Mrs. Agoure, the witness declared, importuned the Spinks brothers for additional time, explaining that her husband's business was improving and they hoped to get their affairs straightened out; that Leon Spinks, who acted as spokesman, replied that

the court had ordered his father's estate settled and that the sale could not be postponed. Some weeks later, the witness continued, a second meeting was held at which time the attorney, Mr. Taggart, urged the parties to come to an amicable understanding. On this occasion the witness, so he testified, bluntly requested Leon Spinks to refinance the loan, whereupon the latter replied, "Well, we can refinance you but it will cost you money." Mrs. Agoure then asked as to the amount and Leon Spinks declared, "We will refinance you for $3,000 and ten per cent interest." The witness claimed that at this juncture Spinks turned to his two brothers and remarked, "We have to be careful of the usury end of it; we will have to see our attorney." The alleged details of the refinancing scheme were not worked out at this time. Several days before the sale by the trustee, the witness went on to say, the parties met for the third time and on this occasion Leon Spinks informed plaintiffs that the Spinks corporation would bid in the property and resell it to them. The witness said he asked "for some paper to that effect" but that this was refused. The witness said further that on March 18th he and Mrs. Agoure attended the sale where "Mr. Mowry, the trust officer, read off the descriptions and the indebtedness and he asked what he was bid, and John Spinks walked up with some figures written on a paper and handed it to Mr. Mowry, . . . ; there may have been some words that I could not hear, but Mr. Mowry picked up his books and Leon said to me, 'Let's go upstairs and finish this up.' " The witness then asserted that after the sale had been completed he went immediately to the escrow department of the Title Insurance & Trust Company where Leon Spinks dictated escrow instructions and where said instructions were signed by the respective parties. On cross-examination the witness admitted there never had been any suggestion of a $5,000 bonus to Spinks brothers as meticulously set forth in the complaint, nor did he have any conversation concerning the transaction with Spinks brothers on March 18th, before the hour of sale, as also alleged in the complaint. The witness admitted too that, despite the alleged oral agreement with the defendants, he made many futile efforts to have other brokers refinance him. Mrs. Agoure corroborated her husband's testimony in many of its details.

The defendants emphatically denied that they had ever agreed, directly or indirectly, to sell the property to the Agoures until after the foreclosure. Leon P. Spinks testified that Mr. and Mrs. Agoure called at his office and asked him to bid in the property and sell it back to them; that they said they had interviewed a number of loan brokers and could not borrow the amount of money needed without paying a large bonus; that they preferred to deal with people they knew and were willing for Spinks brothers to write their own ''ticket''. The witness declared he advised them that he would take up the matter with his attorney and when they returned several days later ''I told them you (referring to his attorney) advised me not to negotiate with anybody about the property before the sale; that it would be embarrassing to me; but if by any chance we should bid the property in, we had a perfect right to negotiate with anybody we saw fit, to sell them the property; . . . ; I did not say that I would go prepared to care for the sale, prepared to bid the property in, no matter what other bids there might be; or anything to that effect, and neither of my brothers, Andrew M. or John W. made any such statement; I did not say that the sale that was to take place on the 18th day of March, 1930, would be only a wash sale, or anything of that kind; nor did I say, 'you will get your property back all right', or words to that effect; I did not say they could trust me and I would bid it in for them and make them a new loan, and not anything was said at this conversation about extending the old loan, or renewing any loan.'' The witness then detailed a conversation he had had with plaintiffs' attorney, Mr. Taggart: ''Mr. Taggart rang me up and said, 'I understand you and the Agoures have not gotten together on the thing', . . . and I said, 'No, we don't want that property', and he said, 'Why don't you sell it back to them after the sale?' And I said, 'I don't think the Agoures are entitled to any consideration; they are two years behind in interest; they worried father a lot over the matter— and they haven't taken care—they haven't taken care or the trouble to renew their paper, and I see no reason to do so' . . . I had a further talk with Mr. Taggart on Monday, he rang me up and asked what you (referring to the attorney for Spinks brothers) said, and I said you warned

me about having any conversation with him or anybody else in the matter, and he said, 'Suppose you bid it in, what profit do you want?' and I said, 'I won't talk to you or anybody else about the matter; you will have to take your chances about the matter as to what I will do or won't do'; that was on Monday, the day before the sale.'' The witness then went on to testify that after the sale Taggart requested him to meet the Agoures and he consented to do so; that at this meeting he and his brothers decided that if they did not sell to the Agoures they probably would be unable to sell at all as there had been no other bidders for the property. Spinks declared that at first he did not know what price to charge for the land, as the question of income tax would have to be taken into consideration; but that after the sale and while the Agoures were waiting he discussed the matter with his brothers and they decided to offer the property for $30,000. Agoure, he said, expressed himself as being satisfied with the price. The witness also testified that the value of the property, although unsalable at the time, was $72,783. The witnesses, John W. and Andrew M. Spinks, gave substantially the same testimony as to conversations with the Agoures. Taggart, called by both sides, testified while a witness for the defendants that he had endeavored prior to the sale to obtain promises from his brother-in-law, Leon Spinks, but had failed; that he had done all he could with Spinks brothers ''without getting into a quarrel with them'' but they refused to commit themselves.

It thus appears that the testimony was in conflict. This is not denied, but appellants advance the rather tenuous argument that when the defendants' evidence is fairly compared with their own the conflict becomes more imaginary than real. In an attempt to substantiate this claim appellants point out that the physical acts of the parties, as differentiated from the nebulous question of motive, show the resale to have been but a thin disguise for an usurious scheme; or, in other words, that the testimony of the defendants was inherently improbable and therefore unworthy of credence. It may be, as urged by appellants, that the acts of the parties speak more convincingly than the explanations and denials of defendants, and that the transaction was but a smug scheme on the part of Spinks brothers to

evade the usury law. But the trial court, which heard the witnesses and observed their demeanor on the stand, reached the opposite conclusion. And we cannot say, as a matter of law, that the evidence was insufficient to justify that conclusion. It is, of course, not the function of appellate courts to determine what credence shall be given particular testimony. To warrant an appellate court in determining that there is no conflict in the evidence because of inherent improbability "there must exist either a physical impossibility of the evidence being true, or such a state of facts so clearly apparent that nothing need be assumed nor any inference drawn to convince the ordinary mind of the falsity of the story". (*Powell* v. *Powell,* 40 Cal. App. 155 [180 Pac. 346].) When there is competent evidence to sustain the findings of the trial court, as in the present case, such findings will not be disturbed on appeal. This rule is too well known to require the citation of authorities.

 Appellants complain of the court's ruling in permitting the witness Taggart to testify as to conversations had with Leon Spinks without the presence of either of the plaintiffs. An objection was interposed on the ground that the witness had not been shown to possess the authority to speak for plaintiffs, but it was apparently withdrawn later, Mr. Boardman (plaintiffs' counsel) declaring, "It is certainly objectionable, but if the court expresses a wish to go into the matter, I am not going to insist on the objection." The witness then testified to certain conversations; also that he had advised Agoure of his negotiations with Spinks brothers and his failure to obtain any promises from them. A similar and proper objection was made when Leon Spinks was asked as to a telephone conversation between himself and the witness Taggart. The court at first sustained the objection but later, with the apparent approval of plaintiffs, admitted the testimony subject to a motion to strike out. At the conclusion of the trial Mr. Boardman said to the court: "There are some matters of procedure remaining so far as the parties are concerned. There were objections made on both sides, and the ruling was made reserving the privilege of counsel to move to strike out testimony if they should so desire; and from my point I don't regard those matters of such importance in respect to the testimony that was elicited. I don't know if Your Honor desires to

pay attention to them or not.'' This was not a specific motion to strike out the testimony now complained of; and in the absence of such motion the objection was waived. (*Estate of Wempe*, 185 Cal. 557 [197 Pac. 949].)

 Lastly, appellants complain that the court erred in not permitting them to amend so as to show that the alleged usurious scheme provided for the payment of a bonus of $3,000 and ten per cent interest instead of $5,000 and eight per cent interest as alleged in the complaint. While the court might properly have permitted the amendment, we see no prejudicial error in its refusal so to do. The case was tried on its merits and the variance between the allegations of pleadings and the proof, as to the amount of the alleged bonus, seems not to have been a factor in the ultimate determination of the cause.

The judgment is affirmed.

Plummer, J., and Pullen, P. J., concurred.