291 P.2d 315

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Ernest TRUJILLO, Defendant-Appellant.**

No. 5901.

Supreme Court of New Mexico.

Oct. 19, 1955.

Rehearing Denied Jan. 3, 1956.

278

John B. Wright, Raton, David Chavez, Jr., Santa Fe, of counsel on appeal, for appellant.

Richard H. Robinson, Atty. Gen., Santiago E. Campos, Asst. Atty. Gen., Fred M. Standley, Asst. Atty. Gen., for appellee.

PER CURIAM.

Upon consideration of this case on rehearing the Court has decided to withdraw the opinion on file and substitute the following therefor:

SADLER, Justice.

The appellant (defendant below) was convicted in the district court of Colfax County of violating 1953 Comp. § 40–34–21 in the indecent handling or touching of a female minor under the age of 18 years and sentenced to a term of not less than one year nor more than two years in the New Mexico State Penitentiary. He prosecutes this appeal from the judgment of conviction so rendered against him.

The parents of the prosecuting witness, a young girl 11 years of age, and the defendant, his wife and children, lived on neighboring ranches a few miles removed from each other in Colfax County, New Mexico. They had been close friends and neighbors for many years.

On the morning of June 16, 1954, Ernest Trujillo, the defendant, his wife, Lola, their two children, aged 22 months and 4 years, respectively, went to the home of Otho Spencer, father of the prosecuting witness, some five miles distant and spent a goodly portion of the day there.

..Late in the afternoon of said day defendant, accompanied by the prosecutrix, a nephew named Adolf, called "Dolfo," aged 5 years, and the defendant's 22 months old baby girl, drove back to his home to enable defendant to do the evening chores. It was still daylight when they arrived at defendant's home but darkness was gradually descending. All went into the house together. The defendant prepared some sandwiches soon after arriving and after eating them the entire party went out in the pickup truck in which they had come looking for some of defendant's cows. They then returned to the house. The defendant asked Dolfo to remain outside in the pickup and told the prosecuting witness to take the baby back into the room of Larry, a son.

Dolfo having left the pickup and come into the house, defendant told him to remain in the kitchen and having asked prosecutrix to take the baby in Larry's room, she informed him that Lola, the baby's mother, always puts her in her little bed. He said they would take her into Larry's room. The living room and dining room are between the kitchen and Larry's room. There was no light on in Larry's room, nor in the hallway adjoining it.

As soon as they were all in Larry's room, that is, the defendant, prosecuting witness and the baby, she asked him to turn on the light. He said, no, to leave it off. She had placed the baby on the bed and given her a bottle and was sitting on its side with her feet on the floor. He was standing on the opposite side of the bed and asked prosecutrix to come over where he was and she declined. He then came over to side of the bed where she was sitting with her feet on the floor. Her testimony in question and answer form follows:

"Q. What did Ernest do when he came over beside you on the side of the bed where you were? A. He asked me if wanted to play a little, and I told him no, and then he just took me by the shoulders and pushed me back and told me to take my leg out of my peddle pushers.

"Q. Now, wait a minute, he pushed you back? A. Yes.

"Q. How far did he push you back? A. Well, when I was laying down.

"Q. You were lying down on the bed then? A. Yes.

"Q. Where were your feet? A. Well, they were flat on the floor.

"Q. Your feet weren't up on the bed? A. No.

"Q. In other words, in that sitting position in which you were in, he just pushed you—A. Yes.

"Q. Then what? A. He told me to take my leg out of my peddle pushers and I didn't and so then he pulled them down a little—

"Q. Now, wait a minute. We want to get exactly what happened, everything that happened. He told you to take your leg out of your peddle pushers. What did you do? A. I didn't, and he—

"Q. Now, what kind of clothing were you wearing at that time? A. Well, I had a light blouse on, my red peddle pushers and panties, and I had a little T-shirt on.

"Q. What are these peddle pushers? A. Well, they are not as long as these and not as short as shorts, they are right below my knees.

"Q. A little longer than knee length, is that right? A. Yes.

"Q. Now, did you have a belt? A. No; they were elastic in the back.

"Q. What about the front part? A. Well, this material, the red material.

"Q. You say you wouldn't pull your peddle pushers down. What happened then? A. Then, when he took my leg out, why—

"Q. How did he do that? A. Well, he pulled them down a little ways and then he just pulled my leg out of my panties and—

"Q. Now, wait—

"Mr. Wright: Let her answer.

"The Court: Don't interrupt her so much. We all want to know what is going on here. Go ahead and tell what happened after that.

"A. Then when he pulled them down why he just sort of pushed my leg up and pulled the leg out, you know, and then when he laid over me and with that thing where he wets, and then I belched twice and he quit and got up and went out and let his cows out and I got up and took the baby and went in the kitchen and first I called Dolfo twice and then he didn't come and I went to the kitchen after that and asked why he didn't come and he said my uncle Ernest told me to stay here.

"Q. Now, you said he took one leg out, which leg was it? A. Well, my left I guess, it was this leg, on this side.

"Q. When you went back in the kitchen, what happened to the baby? A. I had her with me."

Following the occurrences just related, the defendant returned in the pickup to the Spencer home taking with him Ernestine, the baby, Dolfo and the prosecutrix. The Trujillo family lingered at the Spencer home beyond the bedtime of the prosecutrix. She said nothing to her mother or anyone else before going to bed about the occurrence mentioned. She testified further:

"Q. While you were in there, while you and Ernest and the baby were

there in the bed room, did Ernest say anything else to you? A. Yes; he told me not to tell nobody, he kept telling me that because he would get in trouble and I would get a real hard spanking."

Nothing was said by the prosecutrix about the incident the next morning and that afternoon the prosecutrix and her brother went into Springer, their parents going to Raton to attend a square dance during the Entrada Ceremonies. The prosecutrix, her sister aged 13, her brother aged 16 and two companions, boys of 16 years, all went to Springer to a show the afternoon of the day following the occurrence related. The prosecutrix kept noting an impulse to go to the bathroom, but on going could not urinate. But while in the bathroom she noticed blood on her panties. These were not the panties, however, that she had on the night before. They had been removed when she took a bath, changed clothes and panties on preparing for the trip to Springer. On removing the panties worn the night before she had thrown them into the washing machine but an examination disclosed no sign of blood on them.

As soon as prosecutrix discovered the blood on her panties while visiting the toilet in the show, she mentioned to her sister what had happened the night before. Indeed, she had told her sister what had occurred the night before, while taking a shower before leaving home earlier that evening, but she repeated it to her upon finding a blood spot on her panties while in the toilet at the show in Springer. The sister told her brother and he took her immediately to Dr. Joe S. Gunter for an examination.

Dr. Gunter examined the prosecutrix the late afternoon of June 17, 1954. He testified to having made a rather careful examination of her private parts and general examination of her entire body so far as the skin surface was concerned. The examination was limited, however, to what could be seen and felt. No instrumentation was resorted to. He found no swelling, no bruises or tears. He saw no cuts on the body of the child. He observed the blood stains on the panties she wore. He stated if the blood stains were from a discharge it was either through the vagina or bladder, he could not say which.

When the parents of the prosecutrix returned from the Entrada in Raton the night of June 17th, they found the sheriff and state policeman at their house and learned for the first time what had happened. The mother of prosecutrix testified, however, that she had observed something strange about the child throughout the day following the alleged offense against her. Asked to describe her condition, the mother stated:

"A. She acted peculiar all day long.

She didn't act herself at all. * * * She was strange all day long; very strange." ··

It should also be stated as a part of the facts before the jury that the prosecutrix while on the stand testified that she thought defendant tried to put something else besides his finger into her and it caused her to cry out twice, "Ouch!"

The defendant under a plea of not guilty denied on the stand that he had even gone into the back bedroom (Larry's room) with the prosecutrix; denied taking off her peddle pushers; denied touching her private parts with his hands or with his sex organ. His wife as a witness for him testified, among other things, that prior to leaving home on the day in question for the home of the Spencers, parents of the prosecutrix, she had started cleaning Larry's room and had the mattress and bedding outside airing, leaving only bedsprings on the bed in that room. Following his arrest and preliminary examination, the defendant was bound over for trial in the district court. The trial coming on, the jury heard the testimony of all witnesses for the state and defense, deliberated and returned a verdict of guilty. The court duly sentenced defendant to a term of not less than one nor more than two years in the penitentiary. It is to review that judgment that this appeal is prosecuted.

There are two formal claims of error argued by defendant in his brief in chief, namely, (1) that the court erred in failing to give his requested instructions Nos. 1 and 2, each charging the jury that corroboration by other evidence of the testimony of the prosecutrix was essential to a conviction; and (2) that there was no substantial evidence to support a conviction. In the reply brief, however, the defendant raises certain claims of fundamental error which will be noticed later on in our opinion.

We shall first discuss the claim that corroboration is required of the testimony of a prosecuting witness before a conviction can be sustained under the statute on which defendant is being prosecuted. The statute was originally enacted as L.1949, c. 140, § 1, 1953 Comp. § 40–34–21, and, reads:

"A person who shall commit any indecent handling or touching of, or any indecent demonstration or exposure upon, or in the presence of any person under the age of eighteen (18) years, shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment for not more than five (5) years nor less than six (6) months, or by fine of not more than one thousand dollars ($1,000.00) nor less than one hundred dollars ($100.00), or both, in the discretion of the court trying the cause."

Counsel for both the state and defense are in agreement on the proposition that we have not to this time decided whether corroboration of the testimony of a prosecuting witness, supporting a charge under the questioned statute, is essential to a conviction. We have held that in prosecutions for statutory rape, where consent is immaterial and force is not used, corroboration is not essential to a conviction. State v. Shults, 43 N.M. 71, 85 P.2d 591; State v. Walton, 43 N.M. 276, 92 P.2d 157. Thus, in statutory rape, we have only to determine that the testimony of the prosecuting witness is not inherently improbable. In State v. Shults, supra, we said [43 N.M. 71, 85 P.2d 593]:

"In cases of common law rape, in the absence of such corroboration as outcries, torn and disarranged clothing, wounds or bruises, or if there is long delay in making complaint; the evidence may be so inherently improbable as to be unsubstantial. In such cases, unless there is other testimony which points unerringly to the defendant's guilt, we will not uphold a conviction.

"But those circumstances do not appear in statutory rape where consent is immaterial and force is not used. The testimony of a child of tender years is frequently the only evidence obtainable. While in such cases the substantial evidence rule applies, and this court will scrutinize the testimony with great care to discover inherent defects; but if none are found which render her testimony inherently improbable, a conviction will be sustained though her testimony is not corroborated."

Again, in State v. Walton, supra, decided only a short time later, we said [43 N.M. 276, 92 P.2d 158]:

"In the Shults case we distinguished between the common law rule and that applying in cases of statutory rape, where there is absence of such corroboration as outcry, torn and disarranged clothing, wounds or bruises. These corroborating facts need not appear, we said, where consent is immaterial and force is not used. But corroborating facts of this sort do not necessarily occur in statutory rape. There we have only to determine that the testimony of the prosecuting witness is not inherently improbable."

In the foregoing cases we have plainly held that corroboration is not required in cases of statutory rape because the usual concomitant facts present in common law rape, such as torn and disarranged clothing, wounds and bruises, outcries, etc., neither necessarily nor ordinarily appear. If this be the rationale of such decisions, then the reason is fully as strong for not requiring corroboration in the crime of

indecent handling or touching of a minor below the prescribed age. Such corroborating, concomitant facts peculiar to common law rape cases, are as unlikely to appear in cases of indecent handling as in cases of statutory rape.

In California, where there exists a statute somewhat akin to our own for the protection of minor children, it is uniformly held corroboration of a child's testimony is not essential to a conviction. People v. Pollock, 61 Cal.App.2d 213, 142 P.2d 328; People v. Carlson, 73 Cal.App.2d 933, 167 P.2d 812; People v. Campbell, 80 Cal.App. 2d 798, 182 P.2d 626; People v. Showers, 90 Cal.App.2d 248, 202 P.2d 814. In people v. Campbell, the court said [80 Cal.App.2d 798, 182 P.2d 628]:

"Corroboration of the child's testimony is not a prerequisite to a finding of guilt. People v. Carlson, 73 Cal.App.2d 933, 936, 167 P.2d 812; People v. Spillard, 15 Cal.App.2d 649, 59 P.2d 887. The right of courts on appeal to set aside jury verdicts or judgments of a court in a case tried without a jury wherein sex crimes committed upon and with children are involved upon the ground that the testimony of the complaining witness therein is inherently improbable has been fully discussed in the recent cases of People v. Jackson, 63 Cal.App.2d 586, 147 P.2d 94, and People v. Carlson, supra. As was said by our Su-

preme Court in People v. Huston, 21 Cal.2d 690, 693, 134 P.2d 758; 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. Kidroski v. Anderson, 39 Cal.App.2d 602, 605, 103 P.2d 1000. To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. Back v. Farnsworth, 25 Cal.App.2d 212, 219, 77 P.2d 295; Lufkin v. Patten-Blinn Lumber Co., 15 Cal.App.2d 259, 262, 59 P.2d 414; Agoure v. Spinks Realty Co., 5 Cal.App.2d 444, 451, 42 P.2d 660; Hughes v. Quackenbush, 1 Cal.App.2d 349, 354, 355, 37 P.2d 99; Powell v. Powell, 40 Cal.App. 155, 158, 159, 180 P. 346. Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (Hicks v. Ocean Shore Railroad, Inc., 18 Cal.2d 773, 781, 117 P.2d 850.)'."

We approve the soundness of the California cases cited. Our own decisions in

State v. Shults, supra, and State v. Walton, supra, holding corroboration not essential to a conviction in prosecutions for statutory rape, are in line with them. It is but a step from those decisions to a like holding in prosecutions for indecent handling and touching of a minor under 18 years of age. The same reasoning will support a like conclusion under either statute. If the law were otherwise, minors of tender years would easily become prey to the commission of offenses of a lewd and lascivious nature by sex offenders of the most dangerous type, with the law standing by helpless to prosecute and punish. The trial court did not err in refusing defendant's specially requested instructions.

We come next to the second ground relied upon by defendant to secure a reversal. It is based upon the contention that the verdict of the jury lacks substantial evidence to support it. Once we agree that corroboration is not essential to a conviction under this statute we are thrown back on the traditional test which is an application of the substantial evidence rule. If, as stated by this court in State v. Ellison, 19 N.M. 428, 144 P. 10, a man may be convicted of rape on the uncorroborated testimony of a strumpet, then all the more should the uncorroborated testimony of a minor child competent to testify, unless there be something inherently improbable in it, be deemed substantial evidence and suffice to uphold a conviction.

We find nothing so inherently improbable in the testimony of this child related from the stand as would warrant us in declaring, as a matter of law, that it can not support a conviction. As said in State v. Shults, supra, speaking of prosecutions for statutory rape, the testimony of a child of tender years frequently is the only evidence obtainable. The obvious sincerity of a wronged child in telling her sordid story to the jury, under oath, ordinarily carries its own impress of truthfulness. Touching a claim of inherent improbability in the testimony of a child in a prosecution under the act involved in the California cases, cited above, the supreme court of that state, in People v. Huston, 21 Cal.2d 690, 134 P.2d 758, 759, said:

"Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. (Citation omitted.) To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. (Citations omitted.) Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to de-

termine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (Citation omitted.)"

It will be found that, in an effort to establish inherent improbability, counsel are compelled to take as established facts certain items of evidence, tendered by the defense, which the jury was privileged to reject and, under the verdict rendered, unquestionably has rejected. Take, for instance, the testimony of defendant's wife about having removed from the bed, prior to the offense, the bedding and mattress in the room in question, in an unfinished job of house cleaning. The jury was not compelled to accept that testimony as true. The same observation applies to the negative testimony of the two men witnesses that they heard no outcry by the child, both as to nearness to the window of the room in which offense occurred, as well as in other respects.

The same may be said of the failure of the State to place on the stand the 13-year-old sister of prosecuting witness, commented on by defense counsel, if deemed by the district attorney to have knowledge of material evidence. The whole picture of what occurred was extremely revolting and obviously of a delicate nature. Certainly, any reluctance on the part of parents to draw other children of tender years into it can be well understood and appreciated. Likewise, the failure of this immature child to report the offense to her parents, or other members of the family, that evening, or until she actually did so, should be of no more force here to render her story inherently improbable than it was in State v. Sanders, 54 N.M. 369, 225 P.2d 150. The jury declined so to appraise such an omission there, and we decline to do so here. An application of the test applied by the Supreme Court of California in People v. Huston, supra, easily renders the truth of the child's story a question for the jury.

Two claims of fundamental error are presented by counsel for the defendant. They appear for the first time in the reply brief filed on behalf of defendant. Nevertheless, we do not feel disposed to ignore them. First, it is said fundamental error appears in certain testimony given by the wife of defendant while testifying on cross-examination as a witness in his behalf. We find it in the following transcript of her testimony, to-wit:

"Q. Now, on the night of the 17th did you go to the Spencer house after Ernest was taken by the Sheriff, Pope Gossett? A. Yes, sir; I did.

"Q. What time was it, approximately, when you went over there? A. Oh, I don't remember. It must have been about two o'clock I guess.

"Q. Two o'clock in the morning? A. Yes.

"Q. How long did you stay over there? A. Oh, I must have stayed an hour, or an hour and a half.

\* \* \* \* \* \*

"Q. During that time you were over at the Spencers, what did you talk about? A. After I went back over there? Well, when I went in Ida said, My God, she said, Lola, Ernest has raped my baby, and I said I can't believe it, and Otho said Lola I can't believe that, and I said well I can't either, and that is all I can remember."

■ It is said the testimony not only is hearsay, but made at a time when defendant was not present and was highly prejudicial. Obviously, the testimony was hearsay but that did not deny it admissibility, nor the jury a right to consider it, if there was no objection to its admissibility by defendant and there was none. Priestley v. Law, 33 N.M. 176, 262 P. 931; Wellington v. Mutual Benefit Health & Accident Ass'n, 39 N.M. 98, 40 P.2d 630; Ferret v. Ferret, 55 N.M. 565, 237 P.2d 594; Chiordi v. Jernigan, 46 N.M. 396, 129 P.2d 640; Smith v. State, 28 Ala.App. 506, 189 So. 86; Gatewood v. State, Md., 114 A.2d 619; United States v. Costello, 2 Cir., 221 F.2d 668.

■ The mere fact of defendant's absence at time of the statement attributed to the mother of prosecutrix had no bearing on its admissibility had such an objection been made, as none was. Nor, is it at all certain the statement was prejudicial to defendant. It could have been helpful since the witness, accused's wife, is quoting the father of prosecutrix as expressing doubt at that time whether defendant could have done such a thing. It is entirely possible that counsel for defendant deemed the testimony of such doubtful harm that he intentionally refrained from objecting. Whatever the reason, it can not here be converted into reversible error upon which to have a reversal.

Next it is said fundamental error arises on the admission in evidence of a purported statement of defendant to his wife the night following commission of the offense charged. Apparently, it was when his wife first learned of it and following arrival and departure of the officers who had come from Raton to take him into custody that defendant made the purported statement to his wife at the home of prosecutrix. Predicate for questioning accused's wife about the statement had been laid when she was cross-examined after being introduced as a witness in his behalf by the husband, himself, during the following interrogation, to-wit:

"Q. Didn't you tell the Spencers about a conversation between you and your husband? A. I don't remember.

"Q. Don't you recall telling Mr. and Mrs. Spencer this, or this in substance: You had told your husband on the night of the 17th, when the officers came down there, you made the statement to your husband, Have you gone crazy? And Otho and Ida are our best friends. A. No, sir.

"Q. You didn't tell— A. No, sir.

"Q. the Spencers— A. No, sir.

"Q. that you made that statement? A. No, sir.

"Q. And didn't you further tell the Spencers that your husband told you in answer to that that he said Thank God I didn't hurt her? A. No, sir.

"Q. You didn't tell the Spencers that? A. No, sir."

While Otho Spencer, father of prosecutrix, was on the stand later, as a witness for the state, and testifying to a conversation with defendant's wife at the Spencer home on the night of June 17th, or to be more accurate, the early morning of the 18th, questions were asked and answers made, as follows:

"Q. Did Mrs. Trujillo, Lola Trujillo, there relate to you a conversation which took place between she and her husband over at her house before he was taken by sheriff Pope Gossett? A. Yes.

"Mr. Wright: To which the defendant objects for the reason that no proper foundation has been laid, it is improper form of impeachment question.

"The Court: Ask the witness whether she did make a certain statement or that statement in substance.

"Mr. Kearns: If I put it all in one question it will be long involved. I am just fixing the time and place and so forth.

"The Court: That is all right, if he recalls the occasion.

"Q. Now, did Mrs. Trujillo tell you, tell you folks there at that time that she had had a conversation with her husband, Ernest Trujillo?

"The Court: Answer that yes or no.

"A. Yes.

"Q. Did she further tell you that that conversation took place at her house? A. Yes.

"Q. Prior to the time Ernest was taken to jail by Sheriff Gossett? A. Yes.

"Q. Did she further tell you in that conversation she had told her husband this or this in substance: Have you gone crazy, Otho and Ida are our best friends? A. Yes.

"Q. She told you that? A. Yes.

"Q. Did she further tell you that after she made that statement to her husband that he had said to her: I didn't hurt the girl? A. Yes; she did.

"Q. Thank God, I didn't hurt the girl? A. Yes."

It is strongly urged upon us by counsel for defendant that, notwithstanding its hearsay character and the absence of any objection thereto as hearsay, improper cross-examination, or otherwise, we should denominate as fundamental error the accused's purported statement to his wife, "Thank God, I didn't hurt her." Varying reasons are advanced by defendant's counsel for so holding. First, they say it is hearsay, twice removed, the father of prosecutrix relating what defendant's wife told witness that the defendant told her. Then as in case of the statement whose admission was first advanced as fundamental error and already disposed of, they say the statement should not be permitted to prejudice defendant because he was not present when the wife was imputing the statement to him. Finally, they climax their argument on the claim to fundamental character of the error discussed by asserting it violates the immunity afforded the husband from the wife becoming a witness against him without his consent, contrary to the terms of 1953 Comp. §§ 41–12–20 and 41–12–21.

What we have said in disposing of the claim of fundamental error in the admission in evidence of the statement of the accused's wife, as testified to by the mother of prosecutrix hereinabove, applies with equal force to the accused's statement brought into evidence through the lips of his wife in a conversation with Otho Spencer, father of prosecutrix, in so far as concerns its hearsay character and absence of defendant at time the statement was tendered in testimony. The authorities above cited fully support the jury's right to consider the statement now discussed to same extent as in case of the former one.

When we come to the second statement, however, one additional question emerges, namely, whether it violates the husband's right to prevent the wife from testifying against him without his consent, under the statutes cited, supra, to-wit, sections 41–12–20 and 41–12–21. The strongest claim to fundamental error made by counsel rests on the assumption that when the state's witness, father of prosecutrix, was asked the question which brought forth the husband's statement from the lips of his wife, she was an incompetent witness under the statutes cited. But the question asked the witness was by way of impeachment and her competency had already been waived by the husband calling her to the stand as a witness in his own behalf. State v. Moore, 42 N.M. 135, 76 P.2d 19. When

a like objection was interposed, among others, to the purported statement made by a wife prior to trial in that case, we concluded our discussion of the subject in a brief and succinct paragraph by saying:

"Furthermore, the defendant waived the question of competency by later calling his wife to the stand as a witness in his own behalf."

■ In the case at bar he had already done so prior to admission in evidence of the wife's statement. The great weight of authority sustains the proposition that, notwithstanding defendant's right to seal the lips of his wife from testifying against him, once he introduces her as a witness in his own behalf, her incompetency as a witness vanishes. Her credibility as a witness may then be tested on cross-examination by impeachment, or otherwise, to the same extent as may that of any other witness. Our own decision in State v. Moore, supra, holds with the great weight of authority on this proposition. See, also, Smith v. State, 120 Tex.Cr.R. 34, 42 S.W.2d 787, 48 S.W.2d 646; Escobar v. State, 121 Tex.Cr.R. 303, 51 S.W.2d 346; Moten v. State, 121 Tex. Cr.R. 204, 49 S.W.2d 754; State v. Higginbotham, 335 Mo. 102, 72 S.W.2d 65; State v. Stearns, 184 Minn. 452, 238 N.W. 895, and Strand v. State, 36 Wyo. 78, 252 P. 1030.

In State v. Higginbotham, supra [335 Mo. 102, 72 S.W.2d 68], a defendant was charged with rape. On cross-examination the wife was asked whether or not she had stated to her husband, " 'Now, Van, if you had been at home where you ought to have been I would know you were innocent' ". The objection that the statement violated the accused's privilege to keep his wife from testifying was denied on an appeal to the supreme court of Missouri. The court said:

" * * * But this privilege or protection may be waived by the defendant, and where, as here, he sits by without objection and permits the cross-examination to continue to a conclusion, he will be deemed to have waived the benefit of the statute, just as it is held he may waive even constitutional immunity from giving self-incriminating testimony by testifying without objection. * * * Furthermore, we think the evidence was competent and should have been admitted even if the defendant had made timely objection. The statute says the defendant and his wife 'may be contradicted and impeached as any other witness in the case.' Mrs. Higginbotham testified on direct examination that the appellant got home about 9 o'clock. The rape occurred about 11 o'clock. For the purpose of impeaching her it was proper for the state to show that when she and the appellant were confronted by the sheriff and the three other witness-

es about 12:30 or 1 o'clock that night, she said to the appellant, 'Now, Van, if you had been at home where you ought to have been, I would know you were innocent.' The evidence was highly material, and went to the very heart of the appellant's alibi."

So it is in the case at bar, whatever the objections to which the questioned testimony of the wife may actually have been subject, the defendant made none. His counsel now argue it was hearsay. We have cited cases hereinabove showing this to be no valid objection when interposed for the first time on appeal. They argue also, as a basis for the claim of fundamental error, that the questioned statement of the wife came from the lips of a witness sealed by 1953 Comp. § 41–12–20 from testifying against her husband, without his consent.

We have just shown, however, that without formal consent, he may waive her incompetency by introducing her as a witness in his own behalf to the extent, at least, of exposing her testimony to the usual tests of credibility. See State v. Moore, supra, and other cases cited along with it hereinabove. And when a want of *competency* on the wife's part to give in testimony the questioned statement to her by her husband is removed, the basic foundation on which the claim of fundamental error rests disappears. We hold there was no fundamental error in this particular.

We have already held the testimony in this case is not so inherently improbable as to justify a direction on our part to discharge the defendant upon remand. We adhere to that conclusion. We have also held that corroboration of the testimony of the prosecuting witness in a prosecution under 1953 Comp. § 40–34–21 is not essential to a conviction. It should be added, too, that the full court concurs in this holding. A recital of the facts in evidence bringing us to this conclusion will not again be summarized. We quote briefly again from one of the cases cited in said opinion, as follows:

"Corroboration of the child's testimony is not a prerequisite to a finding of guilt. People v. Carlson, 73 Cal. App.2d 933, 936, 167 P.2d 812; People v. Spillard, 15 Cal.App.2d 649, 59 P.2d 887. * * * As was said by our Supreme Court in People v. Huston, 21 Cal.2d 690, 693, 134 P.2d 758; 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. * * *'" People v. Campbell, 80 Cal.App.2d 798, 182 P.2d 626, 628.

It impresses us that to hold the testimony supporting the present verdict is so inherently improbable as to be beyond belief, following our unanimous conclusion

that corroboration is unessential to a conviction under the statute in question, would be giving only lip service to the proposition whose correctness we have just affirmed. Our previous discussion and holding that corroboration is not an essential to conviction under the statute in question has a bearing on this claim. We have quoted already from People v. Huston, supra, a California decision, dealing with this very question.

When there is sifted from any recitation of facts, made to support a claim the testimony is inherently improbable, all facts and inferences which the verdict of guilty resolves against the defendant, there remains testimony of a substantial character sufficient to support the conviction. In the light of the testimony before them, the jury believed the story of this 11-year old girl. They were unable to characterize it as a mere figment of her imagination or the product of someone's evil machination. We find no ground to disturb their verdict.

The minority opinion to the contrary notwithstanding, there is absolutely no evidence that the defendant ever "inserted his fingers as well as his penis into her (the prosecutrix') private parts." Furthermore, the testimony by Dr. Gunter, a defense witness, to the complete absence of bruises, lacerations, or tears around her private parts refutes accuracy of the quoted statement. If such had been the case, the defendant would have been prosecuted for rape.

Before closing, it is only fair to state that the attorney appearing on this appeal as "of counsel," did not participate in the trial below. The judgment will be affirmed.

It is so ordered.

COMPTON, C. J., and McGHEE and KIKER, JJ., concur.

LUJAN, J., dissenting.

LUJAN, Justice (dissenting).

I am unable to agree with the majority opinion in the disposition of this appeal. At the outset I must say that I am not unmindful of the rule frequently announced by this court to the effect that the weight and credibility of the evidence of witnesses is for the jury, and that the court will not reverse a conviction on conflicting evidence when there is substantial evidence supporting the verdict; and also to the effect that a man may be convicted of indecently handling and touching a female child, on the uncorroborated testimony of the prosecutrix. But the verdict of a jury is not necessarily binding on a court of review when it clearly appears from the whole record that such verdict is wrong. The power of a court of review ought not to be left paralyzed so as to prevent a miscarriage of justice, merely by the erroneous

verdict of a jury. See Thuringer v. Trafton, 58 Colo. 250, 144 P. 866.

In the present case, there was, as there always is in a criminal prosecution, a legal presumption that the accused was innocent until proven guilty beyond a reasonable doubt. " 'Unless there is substantial evidence of facts which exclude every other hypothesis but that of guilt it is the duty of the trial judge to instruct the jury to return a verdict for the accused, and where all the substantial evidence is as consistent with innocence as with guilt it is the duty of the appellate court to reverse the judgment against him.' " Isbell v. United States, 8 Cir., 227 F. 788, 792.

The directly incriminating evidence given by the prosecutrix is that on the evening of June 16, 1954, she accompanied the defendant and two very small children to his ranch, and that while in his ranch house the defendant placed her on the bed, pulled out her leg from her peddle pushers and inserted his fingers as well as his penis into her private parts which hurt her quite a bit. This occurrence was flatly denied by appellant.

To corroborate this narration, the prosecutrix was allowed to testify that the following evening while attending a moving picture show at Springer, New Mexico, she went into the rest room and there discovered a spot of blood on her panties. Likewise, the district attorney was permitted to introduce the panties in evidence.

However, it must be pointed out that the panties which had the blood spot on them and which were introduced in evidence by the district attorney were the ones which the prosecutrix put on just before making a trip to Springer in an automobile accompanied by her sister, aged thirteen, her brother aged sixteen and two sixteen year old boys, and not the panties which prosecutrix had on the evening of the alleged occurrence, which she wore continuously for twenty two hours after said incident, and which had no blood on them.

Doctor J. S. Gunter, whose qualifications were admitted by the district attorney, examined prosecutrix the following evening at the request of her brother, and testified as follows:

"* * * Q. What did your examination itself consist of? A. The examination itself consisted of a rather careful examination of her private parts, and a general examination of her entire body so far as the skin surface was concerned.

"Q. Doctor, as a result of that examination did you find any swelling? A. No.

"Mr. Kearns: At this point the State objects to the testimony and moves that the answers to the last two questions be stricken on the ground that under the charge as made against the defendant it is immaterial whether any

physical damage was done to the person of * * * ?

"The Court: Well, I have an answer to that, but if you insist on the objection I will have to excuse the jury so that I might state my reasons. Do you press your objection? Then I will have to excuse the jury.

"Mr. Kearns: No, we won't insist."

. I assume that the trial judge, in view of the prosecutrix' testimony that the defendant had inserted his fingers and penis into her private parts, would have ruled the testimony admissible, as touching upon her credibility.

On resuming his testimony, the doctor further testified:

"Q. Now, the last question I asked you doctor was, as a result of your examination did you find any evidence of bruises? A. I did not.

"Q. Doctor, as a result of that examination did you find any tears? A. I did not.

"Q. Doctor, as a result of that examination did you find any evidence of any lacerations? A. I did not."

We are not here confronted with the crime of rape, but with indecent handling and touching of a female which constitutes the crime, and which involves the same principles of law, to the effect that a man may be convicted on the uncorroborated testimony of the prosecutrix.

We sustained the conviction of a man on the uncorroborated testimony of a nine year old girl, in State v. Ellison, 19 N.M. 428, 144 P. 10. But there the unequivocal facts pointed unerringly to the guilt of the defendant. There the outraged child, immediately after being released from appellant's embrace, and as soon as she could effect her escape, ran from the room where she had been, and ran across the hallway to her own room which was occupied by herself and twin sister. She immediately locked the door. The prosecutrix then divulged some of the details of the crime, in response to question as to why she had locked the door, to her twin sister, and a little playmate and a lady who was chambermaid in the hotel. This information was divulged within ten minutes from the time the act occurred. A physician examined the child that day and he testified:

"Q. State to the jury, Doctor, what you found upon that examination? A. Well, the parts were redder than normal, *extremely sensitive* and a slight tear at the union of the labia of either side as they unite below.

*    *    *    *    *  .    *

"Q. Well, what else did you find, Doctor? A. Well, that was practically all, there was some blood, a very slight amount of blood at that time.

*    *    *    *    *    *

"Q. State whether she complained of any pain when you first went to

examine her? A. Yes, sir, *she was quite tender."*

In the instant case the prosecutrix did not, immediately upon reaching her home, divulge to any member of her family what she claims occurred to her just two hours before, and did not do so until approximately twenty four hours after the alleged occurrence, and then only when she discovered a spot of blood on a pair of panties she did not wear that evening, although she was alone with her mother all of the next day. Further in the case at bar there were no inflammation, bruises, lacerations or tears of her private parts, nor were there any tender or sensitive spots thereon which would be the direct result of the alleged acts committed against her.

In the case of State v. Taylor, 32 N.M. 163, 252 P. 984, the following language is found in syllabus No. 2:

"A conviction of statutory rape based on a prosecutrix's inherently improbable story, uncorroborated by any unequivocal fact pointing unerringly to guilt, will be set aside, in the interest of justice, though the insufficiency of the evidence was not urged in the trial court."

And in the case of State v. Goodale, 210 Mo. 275, 109 S.W. 9, 11, the Supreme Court of Missouri said:

"The all-important question on this appeal is whether the testimony in this case is sufficient to sustain the conviction of the defendant. The admonition of Lord Hale that 'it must be remembered that this is an accusation easily to be made and hard to be proved, and harder to be defended by the party accused, though never so innocent,' must be heeded. While it is the law of this state, as in most others, where not modified by statute, that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, it is nevertheless equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment. While, on the one hand, it will not do to hold that because the evidence indicates a depravity not ordinarily witnessed among men, it must be rejected, because the annals of crime are replete with examples wherein the most sacred relations have been disregarded, and the testimony left no room for a reasonable doubt of the guilt of the accused, yet, on the other, many well-authenticated decisions attest that this charge has often been the result of malice and hidden motives, and the courts have refused to permit convictions to stand because of the utter im-

296

probability of the testimony, in the light of the conceded circumstances."

And in the case of Morris v. State, 9 Okl.Cr. 241, 131 P. 731, 735, it was said:

"The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

I do not want to be understood as holding that a man cannot be convicted of indecently handling or touching a female child upon the uncorroborated testimony of the prosecutrix, but I do conclude that the testimony of the prosecutrix should be clear and convincing and that the unequivocal facts point unerringly to the guilt of the defendant which would leave no room for conjecture.

From a careful reading of the entire record and the evidence given by the prosecutrix, I am of opinion that it is not only unreasonable but highly improbable for the defendant to have committed the atrocious acts against her person, as testified to by her, without having caused some injury to her private parts and thereby leaving physical signs of such atrocity on them.

The defendant's denial that he ever touched the child, coupled with the doctor's testimony, who carefully examined her private parts the following evening, that he found absolutely no signs of any tampering with them, would go to the probative force of a lack of any physical signs of such occurrence.

It is highly significant that the State did not see fit to introduce in evidence the panties prosecutrix wore on the evening of the alleged occurrence and which she wore continuously for approximately twenty-two hours after the acts complained of took place, but did see fit to introduce in evidence the panties which the child wore on a trip in a car with teenagers, and on which she discovered a spot of blood; nor did the state see fit to call the doctor as a witness. As the record stands justice demands a reversal of the judgment.

I am seriously inclined to believe that the verdict was more the result of prejudice and sentiment than the calm and dispassionate conclusion of the jury upon the facts in evidence.

It is my candid opinion that the trial court erred in overruling the defendant's motion for a directed verdict interposed at the conclusion of the state's case and renewed at the close of the entire case. The judgment should be reversed with directions to the district court to set aside its judgment and to enter judgment discharging the defendant. The majority having concluded otherwise, I dissent.